Zaida SANTANA et al.

v.

RAINBOW CLEANERS, Inc. et al.

No. 2007–268–Appeal.

Supreme Court of Rhode Island.

April 30, 2009.

Mark W. Dana, Esq., for Plaintiffs.

Rajaram Suryanarayan, Esq., Providence, for Defendants.

Present: GOLDBERG, Acting C.J., FLAHERTY, SUTTELL, ROBINSON, JJ., and WILLIAMS, C.J. (ret.).

## O P I N I O N

Justice FLAHERTY, for the Court.

Did a community mental health center that treated an outpatient who suffered from a mental disability assume a duty to exercise control over the patient to prevent him from committing an act of violence? Based on the record presented to us in this case, we hold that it did not.

The plaintiff, Zaida Santana, individually, and as parent and next friend of her two children,[1] filed suit in the Providence County Superior Court against the defendant, The Providence Center, Inc., alleging that because of the defendant's negligence, she was severely beaten by David L. Kelly, a man who had been treated for a number of years as an outpatient at the behavioral-health facility owned and operated by the defendant. The plaintiff alleged that the defendant had a duty to supervise and restrain Kelly, essentially to exercise con-

---

1. Although Ms. Santana brought suit in two separate capacities, we shall refer to her in the singular throughout this opinion.

trol over his conduct to prevent the attack. The plaintiff said that the defendant should have initiated certification proceedings pursuant to Rhode Island's Mental Health Law, G.L. 1956 chapter 5 of title 40.1. It is without question that Kelly was a deeply troubled individual; however, a Superior Court justice found that the factors present in this case did not trigger the imposition of a duty upon the defendant, and she granted the defendant's motion for summary judgment. Because our *de novo* review supports the motion justice's conclusions, we affirm the judgment.

## I

### Facts and Travel

On May 26, 2004, a Providence police officer was dispatched to Rainbow Cleaners, Inc., a dry-cleaning business on Reservoir Avenue in Providence, after a disturbance was reported at the store. Once inside the business, the officer observed an employee, Zaida Santana, unconscious and bleeding profusely, the result of multiple blows to the head from a crowbar wielded by David L. Kelly. Apparently, Kelly's rampage on that day began when he struck a neighbor with a wooden plank. He then walked the short distance to Rainbow Cleaners. Santana said that she was working in the back area of the store when she heard a commotion coming from the front. She investigated the cause of the disturbance and witnessed Kelly attacking her coworker. Santana pleaded with Kelly to stop, but she has no recollection of what happened next. Her coworker later informed her that Kelly had struck her in the head with a crowbar. As a result of

the attack, Santana suffered severe head and brain injuries and was admitted to the intensive care unit at Rhode Island Hospital, where she remained unconscious for two weeks. Kelly was arrested and charged with three counts of felony assault.

Kelly was not a stranger to Rainbow Cleaners. He lived in an adjacent apartment and occasionally shoveled snow in front of the business and did other odd jobs around the store. Santana said that Kelly had never threatened her but that she and the other employees were well aware of his mental-health issues. They referred to him as "el loquito," which Santana understood to mean "a little crazy" in Spanish, because of his erratic behavior. Santana said that on one occasion Kelly began screaming that he was James Bond, and another time she observed him breaking glass behind the store. Also, she said that about ten days before the attack, a visibly upset Kelly entered the store and pounded his fist on the counter as he screamed, "[y]ou guys don't love me. Nobody likes me here, and I'm not coming back here." Santana said that she was afraid of Kelly, but that one of the store's owners told her that he was harmless.

In the years leading up to the attack, Kelly had received outpatient treatment at The Providence Center, a private, nonprofit, community mental health center that assists individuals affected by mental illness by providing treatment within a community setting.[2] It appears that the last contact Kelly had with the facility was in January 2004, some four months before he attacked Santana.[3] Following Kelly's ar-

---

**2.** General Laws 1956 § 40.1–8.5–1(b), provides in pertinent part: "The state recognizes private, nonprofit community mental health centers which provide mental health services to children and adults with mental disabilities, and it is the policy of the state to support

these mental health centers as an adjunct and alternative to inpatient services."

**3.** The parties agree that Kelly's mental health history reveals an individual with a chronicle of suffering from a mental disability and that

rest for that assault, The Providence Center concluded that outpatient treatment no longer was a viable treatment option, and it initiated certification proceedings under the state's Mental Health Law. Although he was charged with three counts of felony assault, Kelly was later admitted to the Eleanor Slater Hospital, where he was deemed incompetent to stand trial.[4]

On October 13, 2005, Santana filed suit against Rainbow Cleaners, The Providence Center, and "John Does I–X," the health-care professionals who treated Kelly. The plaintiff later amended her complaint to include the owners of Rainbow Cleaners as defendants. The Providence Center is the only party that remains part of this appeal.[5] In her claim for negligent supervision against defendant, Santana alleged that:

> "Prior to May 26, 2004, the Defendant, Providence Center, owed a duty to those who might come into contact with David L. Kelly to ensure that David L. Kelly was supervised and/or restrained and/or monitored and/or medicated properly because it knew or should have known that David L. Kelly was an individual whose continued unsupervised presence in the community would create an imminent likelihood of serious harm

by reason of mental disability, and was capable of committing acts of violence upon others, pursuant to R.I.G.L. § 40.1–5–7[.]"

Santana contended that she was injured as a direct and proximate result of defendant's breach of this duty.[6] Although not explicitly framed as such, it reasonably may be inferred that plaintiff's claim encompasses an allegation of a breach of a duty to exercise control over Kelly by initiating emergency certification proceedings under § 40.1–5–7.

On March 30, 2007, The Providence Center filed a motion for summary judgment, maintaining that it had no legal duty either to seek to commit Kelly for hospitalization or to warn Santana of his dangerous propensities. It also argued that Santana failed to point to any evidence that would support her allegation: (1) that it negligently supervised Kelly by failing to hospitalize him; or (2) that it knew or should have known of the risk Kelly posed. Significantly, Santana did not offer the Superior Court any facts evidencing that Kelly would have met the stringent requirements for an individual to be committed under the provisions of the Mental Health Law. Nonetheless, plaintiff urged

---

he was frequently treated by The Providence Center. Unfortunately, we are hampered in our analysis of this case because none of Kelly's medical records are part of the record on appeal.

4. The Rhode Island Department of Mental Health, Retardation, and Hospitals operates the Eleanor Slater Hospital. The hospital treats patients with acute and long-term medical illnesses as well as patients with psychiatric disorders. Most of the patients require hospital-level long-term care.

5. The plaintiff initially filed a petition in the Workers' Compensation Court, seeking benefits after the assault. A settlement decree was approved and entered by the court in which

Santana was paid $140,000 on behalf of Rainbow Cleaners. The plaintiff executed a release pursuant to G.L. 1956 § 28–33–25.1. Notwithstanding this release, plaintiff included Rainbow Cleaners in her complaint. However, on February 17, 2006, plaintiff's claims against Rainbow Cleaners were dismissed. Subsequent to that dismissal, the store owners entered into a settlement agreement with Santana. Also, it appears that the "John Does" included in plaintiff's complaint never were identified, and they are not a party to this appeal.

6. The amended complaint also included a loss of consortium claim on behalf of Santana's minor children against defendant.

that the factors in this case supported a legal duty flowing from defendant to her.

The plaintiff's counsel argued to the motion justice that The Providence Center negligently supervised Kelly because it failed to initiate an emergency certification pursuant to § 40.1–5–7. He said that defendant could have filed such an application after the District Court ordered Kelly into counseling at the facility. The motion justice found that there were insufficient duty-triggering factors in this case, and she granted defendant's motion for summary judgment.[7]

On appeal, plaintiff argues that the motion justice erred and that defendant owed her a duty because: (1) a special relationship existed between defendant and Kelly, (2) the scope of the burden imposed on defendant as a result of this duty is reasonable and consistent with valid public policy concerns, and (3) the attack on Santana was foreseeable.[8] The Providence Center reiterates to this Court essentially the same arguments it posited to the Superior Court. It contends that it did not owe a legal duty to Santana, and that even if this Court were to hold that such a duty existed in Rhode Island, plaintiff failed to present any evidence that would trigger it. Therefore, defendant asks this Court to affirm the judgment entered in its favor by the Superior Court.

## II

### Standard of Review

"This Court reviews the granting of summary judgment *de novo* and applies the same standards as the motion justice." *Carrozza v. Voccola,* 962 A.2d 73, 76 (R.I. 2009) (quoting *McAdam v. Grzelczyk,* 911 A.2d 255, 259 (R.I.2006)). Summary judgment is appropriate when, after viewing the admissible evidence in the light most favorable to the nonmoving party, "no genuine issue of material fact is evident from 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any' and the motion justice finds that the moving party is entitled to prevail as a matter of law." *Smiler v. Napolitano,* 911 A.2d 1035, 1038 (R.I.2006) (quoting Super. R. Civ. P. 56(c)). "Therefore, summary judgment should enter 'against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case * * *.'" *Lavoie v. North East Knitting, Inc.,* 918 A.2d 225, 228 (R.I. 2007) (quoting *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986) (construing the substantially similar federal rule)). "[C]omplete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Id.* (quoting *Celotex,* 477 U.S. at 323, 106 S.Ct. 2548).

## III

### Analysis

In a case of first impression, plaintiff asks this Court to impose a duty on a community mental health center to exercise control over the conduct of an outpatient by initiating certification proceedings.

---

7. The plaintiff filed the instant appeal on July 12, 2007. The case was remanded to the Superior Court on June 5, 2008, for entry of final judgment. On June 30, 2008, final judgment was entered and the case was returned to this Court.

8. The plaintiff's brief frequently refers to treatment notes that characterize Kelly as a "homicidal/and or violence risk." However, at oral argument neither counsel was able to inform this Court whether The Providence Center or some other medical provider authored those notes. We have no such medical observation in the record before us.

Although we are sympathetic to this innocent and grievously injured plaintiff, we do not believe that under the facts of this case, defendant owed such a duty to her.

## A

### Duty

 To properly set forth "a claim for negligence, 'a plaintiff must establish a legally cognizable duty owed by a defendant to a plaintiff, a breach of that duty, proximate causation between the conduct and the resulting injury, and the actual loss or damage.'" *Willis v. Omar*, 954 A.2d 126, 129 (R.I.2008) (quoting *Mills v. State Sales, Inc.*, 824 A.2d 461, 467 (R.I. 2003)). "A fundamental principle of tort law, and a dispositive one based on the circumstances of this case, is that '[a] defendant cannot be liable under a negligence theory unless the defendant owes a duty to the plaintiff.'" *Benaski v. Weinberg*, 899 A.2d 499, 502 (R.I.2006) (quoting *Lucier v. Impact Recreation, Ltd.*, 864 A.2d 635, 638 (R.I.2005)). Whether a defendant is under a legal duty in a given case is a question of law. *Martin v. Marciano*, 871 A.2d 911, 915 (R.I.2005) (citing *Volpe v. Gallagher*, 821 A.2d 699, 705 (R.I. 2003)). "This Court has acknowledged that there is no clear-cut formula to determine whether a duty exists in a specific case." *Ouch v. Khea*, 963 A.2d 630, 633 (R.I.2009) (citing *Kenney Manufacturing Co. v. Starkweather & Shepley, Inc.*, 643 A.2d 203, 206 (R.I.1994)). Instead, we employ an *ad hoc* approach that "turns on the particular facts and circumstances of a given case," *Benaski*, 899 A.2d at 502, taking into consideration " 'all relevant factors, including the relationship between the parties, the scope and burden of the obligation to be imposed upon the defendant, public

policy considerations,' * * * and the 'foreseeability of harm to the plaintiff.'" *Selwyn v. Ward*, 879 A.2d 882, 887 (R.I.2005) (quoting *Martin*, 871 A.2d at 915). It is well settled that "issues of negligence are ordinarily not susceptible of summary adjudication, but should be resolved by trial in the ordinary manner." *Gliottone v. Ethier*, 870 A.2d 1022, 1028 (R.I.2005) (quoting *Rogers v. Peabody Coal Co.*, 342 F.2d 749, 751 (6th Cir.1965)). However, in the absence of a duty, "the trier of fact has nothing to consider and a motion for summary judgment must be granted." *Banks v. Bowen's Landing Corp.*, 522 A.2d 1222, 1225 (R.I.1987).

## B

### Controlling a Third Party's Conduct

 There is ordinarily no duty to control a third party's conduct to prevent harm to another individual. The law, however, has recognized an exception to this general rule when a defendant has a special relationship with either the person whose conduct needs to be controlled or with the intended victim of the conduct. The Restatement (Second) of *Torts* § 315 at 122 (1965) reflects the general common law rule of non-liability and its exceptions:

"There is no duty so to control the conduct of a third person as to prevent him from causing physical harm to another unless

"(a) a special relation exists between the actor and the third person which imposes a duty upon the actor to control the third person's conduct, or

"(b) a special relation exists between the actor and the other which gives to the other a right to protection."[9]

---

9. The Restatement (Second) of *Torts* § 315 cmt. (*c.*) at 123 (1965) provides: "The relations between the actor and a third person which require the actor to control the third person's conduct are stated in §§ 316–319." These special relationships include the rela-

Although this Court has not had the opportunity to assess duty in the context of a mental health provider and a patient, we have addressed, in other circumstances, what duty is owed by a defendant to a plaintiff to prevent a third party from harming the plaintiff. In *Volpe*, a landowner-liability case, the defendant allowed her mentally-ill son to live with her in her home, where he kept several firearms. *Volpe*, 821 A.2d at 702–03. The son shot and killed the defendant's neighbor with a weapon that he kept in the house. *Id.* at 703. Under that factual scenario, we held that the defendant owed a duty to exercise reasonable care in controlling her son, concluding that, "under these circumstances, [the] defendant knew or had reason to know that she had the ability to control her son's conduct on her property merely by—as she herself admitted—telling him to remove the guns and ammunition from her house, and, if he failed to do so, by removing them herself." *Id.* at 709.

Likewise, in *Martin*, we recognized that generally a landowner does not have a "duty to protect another from harm caused by the dangerous or illegal acts of a third party." *Martin*, 871 A.2d at 915. But there, we also recognized an exception to the general rule based on a special relationship between the defendant and the plaintiff. *Id.* at 915–16. Specifically, the defendant had hosted a graduation party during which alcohol was served to underage partygoers. *Id.* at 914. Those guests included a third party who attacked the plaintiff with a baseball bat. *Id.* We held that because of this special relationship, the circumstances imposed a duty on the defendant to exercise reasonable care to protect the plaintiff. *Id.* at 915–16.

As we now turn to this case of first impression, we are mindful that we need not write on a blank slate because other jurisdictions have addressed this vexing issue, and we will look to them for guidance.

## C
### *Tarasoff* and its Progeny

We begin our analysis with the California Supreme Court's landmark decision in *Tarasoff v. Regents of the University of California*, 17 Cal.3d 425, 131 Cal.Rptr. 14, 551 P.2d 334 (1976), the first case to hold that a mental health professional may be burdened with an affirmative duty to protect a person from the actions of a violent patient. During the summer of 1969, Prosenjit Poddar, a graduate student at the University of California, Berkley, sought voluntary outpatient therapy at the university hospital after he became severely depressed. *Id.* at 341. During the course of treatment, Poddar told his psychologist that he planned to kill a young woman when she returned home from Brazil; the woman was unnamed, but nonetheless readily identifiable to the therapist as Tatiana Tarasoff. *Id.* After the therapist conferred with two colleagues, he determined that Poddar should be committed to a mental hospital for observation. *Id.* He then notified the campus police and requested their assistance in confining Poddar. *Id.* The police detained Poddar, but they released him after they determined that he was rational and after they secured a promise from him that he would stay away from Tatiana. *Id.* The therapist's supervisor then directed that no further action be taken to confine or otherwise detain Poddar. *Id.* Neither Tatiana nor

tion between: a parent and a child, *see id.* at § 316, an employer and an employee, *see id.* at § 317, an actor who allows another to use his or her land or chattels, *see id.* at § 318,

and someone who takes charge of a person "whom he knows or should know to be likely to cause bodily harm to others if not controlled." *Id.* at § 319.

her parents were ever warned of Poddar's homicidal ideation. *Id.* at 340. Tragically, two months later, after Tatiana returned to the United States, Poddar followed through with his threat and he murdered her. *Id.* at 339, 341.

Tatiana's parents filed suit against the University of California, the therapists who treated Poddar, and the campus police. *Tarasoff,* 551 P.2d at 340 n. 2. They argued that the therapists and police acted negligently in failing to secure Poddar's confinement, and in failing to warn Tatiana, or others likely to alert her of the danger she faced. *Id.* at 341. The court held that:

> "When a therapist determines, or pursuant to the standards of his profession should determine, that his patient presents a serious danger of violence to another, he incurs an obligation to use reasonable care to protect the intended victim against such danger. The discharge of this duty may require the therapist to take one or more of various steps, depending upon the nature of the case. Thus it may call for him to warn the intended victim or others likely to apprise the victim of the danger, to notify the police, or to take whatever other steps are reasonably necessary under the circumstances." *Tarasoff,* 551 P.2d at 340.

In the more than thirty years since this seminal decision, *Tarasoff*-type duties have been widely accepted throughout the country and imposed through either the common law or by statute.[10] There have been a variety of different approaches;

some courts treated both warning a potential victim and controlling a dangerous patient as options under a duty to protect, while other courts have reasoned that warning victims and controlling patients are separate duties, each with different requirements that trigger the respective duty. *Compare Lipari v. Sears, Roebuck and Co.,* 497 F.Supp. 185, 193–94 (D.Neb. 1980) (holding that duty to protect requires a therapist to initiate whatever precautions are reasonably necessary, which may include warning potential victims or committing a patient to a facility under appropriate circumstances) *with Emerich v. Philadelphia Center for Human Development, Inc.,* 554 Pa. 209, 720 A.2d 1032, 1043, 1044 n. 13 (1998) (holding that duty to warn exists under very limited circumstances, but not addressing any separate duty to commit a patient to inpatient treatment). Typically, when courts recognize a duty to warn, they require a threat directed toward a specific or readily identifiable victim. *See Thompson v. County of Alameda,* 27 Cal.3d 741, 167 Cal.Rptr. 70, 614 P.2d 728, 738 (1980); *Emerich,* 720 A.2d at 1043. When the duty is to control, and not to warn a specific person, courts generally require the existence of a special relationship, where the defendant: (1) knew or should have known that the patient posed a serious risk of violence to others; and (2) had the legal right and ability to control the patient. *See Abernathy v. United States,* 773 F.2d 184, 189 (8th Cir.1985); *Hinkelman v. Borgess Medical Center,* 157 Mich.App. 314, 403 N.W.2d 547, 551–52 (1987). Many of

---

10. *See* Peter F. Lake, *Revisiting Tarasoff,* 58 Alb. L.Rev. 97, 98 (1994) (noting that *Tarasoff* "has been widely accepted (and rarely rejected) by courts and legislatures in the United States as a foundation for establishing duties of reasonable care upon psychotherapists to warn, control, and/or protect potential victims of their patients who have expressed

violent intentions"). Only a few states have explicitly rejected *Tarasoff v. Regents of the University of California,* 17 Cal.3d 425, 131 Cal.Rptr. 14, 551 P.2d 334 (1976). *See Boynton v. Burglass,* 590 So.2d 446, 447 (Fla.Dist. Ct.App.1991); *Thapar v. Zezulka,* 994 S.W.2d 635, 638 (Tex.1999); *Nasser v. Parker,* 249 Va. 172, 455 S.E.2d 502, 505–06 (1995).

these cases turn on whether a patient has been admitted to a facility, thus enhancing the ability to control the patient. *See Bradley Center, Inc. v. Wessner*, 250 Ga. 199, 296 S.E.2d 693, 695–97 (1982). Other courts, as discussed below, however, suggest that mental health providers may have a duty to exercise control by seeking commitment when appropriate, even in the case of an outpatient.

**D**

**Commitment of the Mentally Disabled**

■ In this case, Santana contends that The Providence Center owed a duty to those who might come into contact with Kelly to ensure that he was "supervised and/or restrained and/or monitored and/or medicated properly" because it knew or should have known that he "was an individual whose continued unsupervised presence in the community would create an imminent likelihood of serious harm by reason of mental disability," and because he was "capable of committing acts of violence upon others."[11] The plaintiff's overarching argument is that defendant had a

duty to exercise control over Kelly's conduct by seeking to have him committed.[12]

■ It is undisputed that Rhode Island law provides statutory vehicles that allow a mental health professional to seek to have an individual committed to an appropriate facility in both emergency and non-emergency situations. *See* §§ 40.1–5–7, 40.1–5–8. But, the sections of the Mental Health Law providing for the initiation of certification proceedings are discretionary; they are not mandatory. *See Ferreira v. City of East Providence*, 568 F.Supp.2d 197, 214 (D.R.I.2008). Consistent with our state's public policy, the Mental Health Law makes the commitment of a mentally disabled individual a very difficult undertaking.

For example, in an emergency situation, an examining physician or a qualified mental health professional who believes that an individual "is in need of immediate care and treatment, and is one whose continued unsupervised presence in the community would create an imminent likelihood of serious harm by reason of mental disability," may apply for emergency certification to a facility. Section 40.1–5–7(a)(1). Signifi-

11. The plaintiff relies on *Coombes v. Florio*, 450 Mass. 182, 877 N.E.2d 567 (2007) to support the argument that defendant owed her a duty in this case. However, that case is factually distinguishable from the one before us. In *Coombes*, the Massachusetts Supreme Judicial Court held that a physician owed a duty of reasonable care to all those put at risk by his failure to warn a patient of the risks associated with his medical treatment and the known side effects of his medication. *Id.* at 572–73. We disagree with plaintiff that *Coombes* compels this Court to impose a duty in this case because that case involved a duty to warn, not the duty to control. Indeed, the court in *Coombes* said that § 315 of the Restatement "would have limited relevance because it provides only that a person has no duty to *control* the conduct of another in the absence of a special relationship, whereas the

duty claimed by the plaintiff is merely a duty to *warn*." *Coombes*, 877 N.E.2d at 575.

12. During the proceedings in the Superior Court, plaintiff argued that defendant should have applied to have Kelly committed under G.L. 1956 § 40.1–5–7, which provides for emergency certification. On appeal, plaintiff argues that The Providence Center should have sought to have Kelly committed pursuant to § 40.1–5–8, which allows civil-court certification. It is well settled that this Court will not consider an issue on appeal that was not raised before the motion justice. *Hill v. Rhode Island State Employees' Retirement Board*, 935 A.2d 608, 614 (R.I.2007). However, even if plaintiff had properly raised this argument below, our holding would not change, as our consideration of the factors in this case leads us to conclude that defendant did not owe a duty to plaintiff.

cantly, the application must be based on the applicant's personal observations of the individual within the previous five days. Section 40.1–5–7(b). Within one hour of arriving at such a facility, the person must be seen by a physician, and within twenty-four hours a psychiatrist or physician must begin a preliminary evaluation and examination to be completed within seventy-two hours. Section 40.1–5–7(c). If, after the evaluation, the psychiatrist determines that emergency certification is improper, the person must be discharged. *Id.* Conversely, if the psychiatrist believes the person is a proper subject for emergency certification, then the application is confirmed, "provided the facility is one which would impose the least restraint on the liberty of the person consistent with affording him or her the care and treatment necessary and appropriate to his or her condition and that no suitable alternatives to certification are available." *Id.* Significantly, a person must be discharged after ten days unless an application for a civil-court certification has been filed and set down for a hearing or unless the person remains as a voluntary patient. Section 40.1–5–7(g).

In a nonemergent situation, "[a] verified petition may be filed in the district court, * * * for the certification to a facility of any person who is alleged to be in need of care and treatment in a facility, and whose continued unsupervised presence in the community would create a likelihood of serious harm by reason of mental disability." Section 40.1–5–8(a). The petition may be filed by a number of individuals, including "the director of any facility, or his or her designated agent whether or not the person shall have been admitted and is a patient at the time of the petition." *Id.* The petition must be based upon the personal observation of the petitioner within the last ten days; it must indicate what alternatives to certification

are available, what alternatives have been investigated, and why they are not suitable. Section 40.1–5–8(b). The petition also must include the certificates of two physicians setting forth their opinion that the prospective patient is in need of care and treatment in a facility and would likely benefit therefrom, and is one whose continued unsupervised presence in the community would create a likelihood of serious harm by reason of mental disability, together with the reasons why. Section 40.1–5–8(c). A preliminary hearing is required within five business days from the date of the filing, and if the court finds that there is no probable cause to support certification, the petition must be dismissed and the patient discharged, unless he or she applies for voluntary admission. Section 40.1–5–8(d). However, if the court is satisfied that there is probable cause to support certification, a final hearing shall be scheduled, in which the person is given the opportunity to present evidence and cross-examine the witnesses against him or her, including any physician involved in certification. Section 40. 1–5–8(d),(i). After the hearing, if the court finds by:

> "[C]lear and convincing evidence that the subject of the hearing is in need of care and treatment in a facility, and is one whose continued unsupervised presence in the community would, by reason of mental disability, create a likelihood of serious harm, and that all alternatives to certification have been investigated and deemed unsuitable, it shall issue an order committing the person to the custody of the director for care and treatment or to an appropriate facility." Section 40.1–5–8(j).

As in the emergency situation, to the extent practicable, the person must be cared for in a facility that imposes the least restraint upon his or her liberty, consistent with affording the care and treatment nec-

essary and appropriate to his or her condition. *Id.* Importantly, the District Court must consider fully the alternatives to inpatient care.[13] *Id.*

To support her argument that defendant owed her a duty, plaintiff directs us to *Naidu v. Laird,* 539 A.2d 1064 (Del.1988), a case involving a patient who suffered from severe and chronic paranoid schizophrenia. *Id.* at 1066–67. The patient had an extensive history of mental illness and he had been committed to various hospitals on nearly twenty occasions. *Id.* at 1067–68. In March 1977, the patient voluntarily committed himself after another psychotic episode, but he requested that he be discharged a few days later. *Id.* at 1069. Because the patient had been voluntarily committed, the hospital had five days under Delaware law to either release him or seek to commit him involuntarily. His doctors decided to release the patient. *Id.* Five and a half months later, in a psychotic state, the patient drove his vehicle into another car, killing the other driver. *Id.* The victim's wife filed suit against the doctors and the hospital that treated the patient, alleging that the defendants were grossly negligent in the care, treatment, and discharge of the patient and that such gross negligence was a proximate cause of her husband's death. *Id.* at 1066. In their defense, the doctors argued that because the patient did not pose a threat of harm to himself or others at the time he requested to be discharged, there was a statutory obligation to release him. *Id.* at 1071. In imposing a duty, the court said that the state's mental health statutes "do not fully define all the duties of mental health professionals," nor do they "elimi-

nate the common law duty to use reasonable care in the treatment and discharge of mentally ill patients to protect against reasonably foreseeable events." *Id.* at 1072. The court held that "[t]he special relationship which exists between mental health professionals and a patient provides the underlying basis for imposition of an affirmative duty owed by such professionals to persons other than the patient." *Id.* at 1075. "That duty is to take whatever steps are reasonably necessary and available to protect an intended or potential victim(s) of the patient when the psychiatrist determines or should have determined, in keeping with the professional standards of the community, that the patient presents an unreasonable danger to that person(s)" *Id.*

It also has been held that a mental health provider's duty may include initiating involuntary commitment proceedings against an outpatient. *See Lipari,* 497 F.Supp. at 193–95. In *Lipari,* a mentally-ill patient was receiving psychiatric treatment from the Veterans Administration. *Id.* at 187. Against his doctor's advice, the patient, who, like Kelly, had directed no specific threats against any person, stopped attending therapy. *Id.* Shortly after he ceased treatment, the patient fired a shotgun into a crowded nightclub, killing a man, and seriously wounding his wife. *Id.* The plaintiffs argued that the hospital had a duty to detain the patient or to institute involuntarily commitment proceedings against him. *Id.* at 188. The court denied the defendant's motion to dismiss and refused to rule as a matter of law that there *never* is a duty to attempt to detain a patient by initiating commitment proceedings.[14] *Id.* at 193. Instead, the

---

**13.** In *Rhode Island Department of Mental Health, Retardation and Hospitals v. R.B.,* 549 A.2d 1028, 1031 (R.I.1988), this Court held that the District Court has the option of certifying an individual to outpatient treatment at

an authorized community mental health center (such as The Providence Center) as an alternative to inpatient treatment.

**14.** Other courts have addressed whether a mental health provider may have a duty to

court held that "when, in accordance with the standards of his profession, the therapist knows or should know that his patient's dangerous propensities present an unreasonable risk of harm to others," he has an affirmative duty to "initiate whatever precautions are reasonably necessary to protect potential victims of his patient."[15] *Id.*

### E

### The Factors in this Case Do Not Give Rise to a Legal Duty

■ As the above discussion shows, the question of legal duty in cases involving a mental health provider and a patient is multifaceted, resulting in no uniform standard to apply to the issue before us. As we have said, "no clear-cut formula for creation of a duty exists that can be mechanically applied to each and every negligence case." *Kenney Manufacturing Co.,* 643 A.2d at 206. Instead, our approach is *ad hoc* and turns on the particular factors of a given case. *Ferreira v. Strack,* 636 A.2d 682, 685 (R.I.1994). In this case, those factors include: (1) the relationship between Kelly and defendant, (2) the foreseeability of harm to plaintiff, (3) the extent of the burden to defendant and the consequences of imposing a duty with re-

exercise control over a patient by initiating commitment proceedings. In *Schuster v. Altenberg,* 144 Wis.2d 223, 424 N.W.2d 159 (1988), a patient's family sued a treating physician after an outpatient was killed in an automobile accident that also seriously injured the patient's daughter. *Id.* at 160–61. The Wisconsin Supreme Court categorized the plaintiffs' claims as negligent diagnosis and treatment, failure to warn the patient's family of her condition and its dangerous implications, and a failure to seek the patient's civil commitment. *Id.* at 161. The court held that:

> "Wisconsin negligence law precludes a holding that a psychotherapist does not have a duty to warn third parties or to institute proceedings for the detention or commitment of a dangerous individual for the protection of the patient or the public. In the instant case, if it is ultimately proven that it would have been foreseeable to a psychiatrist, exercising due care, that by failing to warn a third person or by failing to take action to institute detention or commitment proceedings someone would be harmed, negligence will be established." *Id.* at 166.

*See also Petersen v. State,* 100 Wash.2d 421, 671 P.2d 230, 237 (1983) (en banc) (psychiatrist had duty to take reasonable precautions to protect persons who might be endangered by patient, including duty to petition for extended commitment); Brian Ginsberg, *Tarasoff at Thirty: Victim's Knowledge Shrinks the Psychotherapist's Duty to Warn & Protect,* 21 J. Contemp. Health L. & Pol'y 1, 15 (2004)

(recognizing that popular reading of the duty articulated in *Tarasoff* associates protecting others with committing dangerous patients to mental hospitals). *But see Currie v. United States,* 836 F.2d 209, 212–14 (4th Cir.1987) (holding that the North Carolina Supreme Court would not impose a duty on therapist of affirmatively seeking control over his patient through initiating involuntary commitment proceedings); *Boulanger v. Pol,* 258 Kan. 289, 900 P.2d 823, 835 (1995) (refusing to recognize duty to seek involuntary commitment when defendants did not have requisite control over voluntary patient).

**15.** In *Munstermann v. Alegent Health–Immanuel Medical Center,* 271 Neb. 834, 716 N.W.2d 73 (2006), the Nebraska Supreme Court said that the *Lipari* court correctly predicted that it would adopt § 315 of the Restatement. *Munstermann,* 716 N.W.2d at 81. However, the *Munstermann* court noted that subsequent to *Lipari,* the Nebraska legislature enacted statutes that limited a *"Tarasoff* duty to situations in which the patient communicates a serious threat of physical violence * * *." *Id.* at 84. Relying on these statutes, the court held that the duty to warn or to protect arises only in limited circumstances, namely when the patient has communicated a serious threat of physical violence against himself, herself or a readily identifiable victim or victims. *Id.* at 85. The court said that this duty shall be discharged if reasonable efforts are made to communicate the threat to the victim or victims and to a law enforcement agency. *Id.*

sulting liability for breach, and (4) public policy considerations.

## 1

### The Relationship Between Kelly and The Providence Center

Our analysis necessarily focuses on the nature of the relationship between a voluntary outpatient and a community mental health center that treated the patient, and the degree of control, if any, that the facility may have exercised over the patient as a result of the relationship. A common thread running through many of the cases that address the liability of mental health providers for the violent actions of their patients is control—whether the provider had the ability to control the conduct of the patient. Indeed, some courts have concluded that no duty can be imposed on a provider in an outpatient setting because of the lack of ability to control the patient. For example, in *Hasenei v. United States,* 541 F.Supp. 999 (D.Md. 1982), the court said that a special relationship must include the right or the ability to control the conduct of another, and "in the absence of a relationship involving such control, the exception to the general rule, that there is no duty to control the conduct of a third person for the protection of others, should not be applicable." *Id.* at

1009. The court reasoned that "the typical relationship existing between a psychiatrist and a voluntary outpatient would seem to lack sufficient elements of control necessary to bring such relationship within the rule of § 315." *Hasenei,* 541 F.Supp. at 1009; *see also Nasser v. Parker,* 249 Va. 172, 455 S.E.2d 502, 505–06 (1995).

We need not and we do not say that an outpatient relationship *never* can give rise to an affirmative duty to control the patient's conduct. Although there is undoubtedly less ability to control an outpatient than in the situation of an inpatient, the relationship nevertheless may in some circumstances, conceivably give rise to a duty.[16] However, we cannot agree with plaintiff's argument that the relationship between a mental health provider and its patient, in and of itself, is sufficient to give rise to a duty to control the patient. The plaintiff argues that Kelly's long history of treatment resulted in a special relationship, and therefore, a duty to control Kelly by initiating certification proceedings. But, to impose a duty to control, there must be an opportunity to exercise such control. Based on the record before us, defendant possessed neither the legal authority nor the opportunity to exercise such control. Santana did not produce any evidence that would have supported an

---

**16.** We note the rationale of the Ohio Supreme Court in *Estates of Morgan v. Fairfield Family Counseling Center,* 77 Ohio St.3d 284, 673 N.E.2d 1311 (1997), where a duty was imposed on a psychiatrist treating an outpatient. The court said:

> "[T]hose courts which find the ability to control to be lacking in the outpatient setting tend to take a rather myopic view of the level or degree of control needed to impose the duty. They appear to assume that in order to satisfy Section 315 in general, or Section 319 in particular, there must be actual constraint or confinement, whereby the third person's physical liberty is taken away or restricted. In viewing the issue

in this way, these courts fail to recognize that the duty to control the conduct of a third person is commensurate with such ability to control as the defendant actually has at the time. * * * In other words, it is within the contemplation of the Restatement that there will be diverse levels of control which give rise to corresponding degrees of responsibility." *Estates of Morgan,* 673 N.E.2d at 1323.

In response to the holdings in *Estates of Morgan,* the Ohio General Assembly amended § 5122.34 and enacted § 2305.51 of the Ohio Revised Code Ann. (LexisNexis 2008, 2005) to limit the liability of mental health providers.

involuntary commitment of Kelly, nor have we been supplied with any medical records illustrating what the patient's condition was when the District Court last ordered him into counseling at The Providence Center, or what his condition was when he was last treated there, some four months before he attacked Ms. Santana. The plaintiff also failed to present any physicians' affidavits in opposition to defendant's motion for summary judgment.[17] In the absence of this material, we cannot conclude that defendant had the ability to control Kelly; thus, we do not believe that a special relationship existed that would trigger a corresponding duty to control him. We would be engaging in pure speculation were we to hold otherwise.

### 2

### The Foreseeability of Harm to Plaintiff

 Foreseeability alone does not create a duty; instead, it is one of a number of factors that must be considered. *Ferreira,* 636 A.2d at 688 n. 4. With respect to "the determination of duty, the foreseeability inquiry considers generally whether 'the category of negligent conduct at issue is sufficiently likely to result in the kind of harm experienced that liability may appropriately be imposed on the negligent party.'" *Martin,* 871 A.2d at 917 (quoting *Banks,* 522 A.2d at 1226–27). In this case,

the alleged negligent conduct by defendant was the failure to exercise control over Kelly by initiating certification proceedings. Because plaintiff submitted no evidence that Kelly could have been committed, we are unable to conclude that the type of harm suffered was a foreseeable consequence of defendant's failure to initiate such proceedings.

### 3

### The Extent of the Burden to Defendant and the Consequences of Imposing a Duty with Resulting Liability for Breach

In our opinion, imposing a duty on defendant in this case would be manifestly unjust. A frequent argument against imposing a *Tarasoff*-type duty has been that it would result in the overcommitment of patients as mental health professionals operated under the increased fear of potential liability.[18] If we imposed a duty in this case, in the absence of any evidence that the patient met the statutory requirements for commitment, then mental health professionals, faced with a choice between initiating certification proceedings and potential liability, certainly would feel pressure to choose the former option. This result would run contrary to the state's plan for

---

**17.** The plaintiff alleged that defendant "knew or should have known" that Kelly "was an individual whose continued unsupervised presence in the community would create an imminent likelihood of serious harm by reason of mental disability." However, plaintiff has not demonstrated that defendant had such knowledge, or that it should have had such knowledge. It may have been possible that plaintiff could have demonstrated that defendant "should have known" of Kelly's potential dangerousness, according to the standards of the profession, through the introduction of expert affidavits. *See Bardoni v. Kim,* 151 Mich.App. 169, 390 N.W.2d 218, 222 n. 6 (1986).

**18.** The dissent in *Tarasoff* said that the majority opinion "greatly increases the risk of civil commitment—the total deprivation of liberty—of those who should not be confined." *Tarasoff,* 131 Cal.Rptr. 14, 551 P.2d at 360 (Clark, J., dissenting). *But see* Daniel J. Givelber et al., *Tarasoff, Myth and Reality: An Empirical Study of Private Law in Action,* 1984 Wis. L.Rev. 443, 478 (stating that a survey of psychiatrists, psychologists, and social workers shows "slight support" for the conclusion that the use of involuntary commitment will increase after *Tarasoff*).

treating patients in a manner that places the least restraint on their liberty. *See* G.L. 1956 § 40.1–8.5–1(a) (providing that "[t]he state recognizes that children and adults with mental disability are entitled to appropriate, accessible, and adequate mental health services *in the least restrictive environment* which appropriately can serve their needs.") (emphasis added). Under the circumstances presented to us here, we are not willing to create this burden nor its likely outcome.

### 4

### Public Policy Concerns

Lastly, in reaching our decision today, we are mindful that any consideration in the instant case must reflect not only public policy but also notions of fairness. We recognize the vitally important and often difficult services that the community mental health centers of this state and their employees provide on a daily basis in treating those afflicted with mental illnesses. We balance that against the public's interest in being protected from unprovoked, violent attacks, such as the one visited upon Ms. Santana, as well as against the liberty interests of individuals suffering from mental illnesses. Kelly may have had a long battle with mental illness, but he also had a constitutionally protected liberty interest. *See Addington v. Texas,* 441 U.S. 418, 425, 99 S.Ct. 1804, 60 L.Ed.2d 323 (1979) (noting that Supreme Court "repeatedly has recognized that civil commitment for any purpose constitutes a significant deprivation of liberty that requires due process protection"). This Court has said that the Rhode Island Mental Health Law was "carefully crafted" to ensure that a patient's liberty interest would be "scrupulously protected." *In re Doe,* 440 A.2d 712, 714 (R.I.1982); *see* §§ 40.1–5–7, 40.1–5–8. We conclude that valid public policy concerns and notions of

fairness militate against imposing a duty under the facts of this case.

### IV

### Conclusion

After carefully weighing the critical factors of the duty analysis, we hold that as a matter of law in the circumstances of this case, the defendant did not have a duty to exercise control over Kelly by initiating certification proceedings. Because we conclude that the defendant had no duty in this case, the plaintiff cannot prevail on her allegation of negligent supervision, and therefore, summary judgment was properly granted. Finally, the plaintiff's claim of loss of consortium also must fail because it "is well settled that a loss of consortium claim 'depends on the success of the underlying tort claim.'" *Olshansky v. Rehrig International,* 872 A.2d 282, 291 (R.I. 2005) (quoting *Soares v. Ann & Hope of Rhode Island, Inc.,* 637 A.2d 339, 353 (R.I. 1994)).

For the reasons stated in this opinion, we affirm the judgment of the Superior Court. The record in this case shall be returned to that tribunal.