Rebecca L. GUSHLAW et al.

v.

Matthew J. MILNER et al.

No. 2009–376–Appeal.

Supreme Court of Rhode Island.

May 10, 2012.

---

Donna M. DiDonato, Esq., for Plaintiff.

Donna M. Lamontagne, Esq., Providence, for Defendant.

Present: SUTTELL, C.J., GOLDBERG, FLAHERTY, ROBINSON, and INDEGLIA, JJ.

## OPINION

Justice INDEGLIA, for the Court.

The plaintiff's appeal[1] in this case presents this Court with an issue of first impression—does the driver of a motor vehicle, who is an adult but underage drinker, have a duty to protect third parties from the tortious conduct of an intoxicated individual he or she has agreed to transport, who is likewise an adult but underage drinker, by preventing that individual from subsequently operating a motor vehicle? Though mindful of the tragic consequences that far too often result from an alcohol-impaired individual's decision to navigate the roadways, as was the case here, we hold that, under the factual circumstances at hand, no such duty to third parties existed on the part of the defendant-driver to prevent his intoxicated passenger from later operating his own motor vehicle. Accordingly, for the reasons set forth in this opinion, we affirm the judgment of the Superior Court.

## I

### Facts and Travel

The facts of this case are generally not in dispute. On the evening of August 12, 2005, defendant Joseph M. Clukey (Mr. Clukey) invited his friend Matthew J. Milner (Mr. Milner) to a party at the Hampton Inn in Warwick, Rhode Island. At the time, Mr. Clukey was nineteen years of age and a high school graduate; Mr. Milner was twenty years old and had graduated in 2003 from the same high school, a year before Mr. Clukey.[2] In preparation for the night's activities, Mr. Clukey and Mr. Milner agreed to meet at a local con-

1. In fact, there are several plaintiffs involved in this case—Rebecca L. Gushlaw, individually and on behalf of her four minor children, and Judith Gushlaw, in her capacity as the co-administrator, along with Rebecca L. Gushlaw, of the estate of Eldrick L. Johnson. For simplicity's sake, we shall refer to these plaintiffs in the singular form.

2. According to Mr. Clukey, he and Mr. Milner had known each other from school and had been good friends for the previous three years.

venience store—a short distance from both of their Smithfield, Rhode Island, residences—at 8:45 p.m. in their respective vehicles. Upon arrival at the convenience store, the two men decided that Mr. Clukey would drive his car for the trip from Smithfield to the hotel party. En route, the pair stopped off at a liquor store, from which Mr. Milner was apparently able to purchase an "eighteen-pack" of beer.[3] From there, they proceeded to the hotel, arriving sometime between 9:30 p.m. and 10 p.m.

The record reveals that the hotel party, hosted by a seventeen-year-old minor in a single hotel room, was attended by eight to fifteen guests, including Mr. Clukey and Mr. Milner. During their stay at the party, the two men each consumed seven to eight cans of beer. According to Mr. Clukey, Mr. Milner became "a lot louder and more obnoxious" as he continued to drink the beers. At some point during the party, the attendees decided to relocate to the pool area of the hotel. The plaintiff contends that while at the pool, the hostess of the party expressed to Mr. Milner that she "hope[d] [he was] not driving," to which Mr. Clukey interposed that he would be doing the driving, not Mr. Milner.[4] Soon thereafter, the two men departed in Mr. Clukey's vehicle with Mr. Clukey at the wheel and headed back to Smithfield to a friend's house "about two streets down" from Mr. Miner's residence. Upon arrival, Mr. Clukey and Mr. Milner joined a small group of guests, some of whom were "hanging out watching TV," "outside smoking cigarettes," or cooking on the barbeque. Neither Mr. Clukey nor Mr. Milner consumed any alcohol at the house, because the nineteen-year-old hostess made none available and requested that guests not bring alcoholic beverages.

Apparently, the pair's appearance at the gathering was short-lived—after less than an hour,[5] the hostess asked Mr. Milner to leave for "joking around," "yelling" and "being loud" in the yard. According to Mr. Clukey, he offered to "bring [Mr. Milner] home" and attempted to facilitate their departure over Mr. Miner's initial objections. After some convincing, Mr. Miner agreed to leave, and the two set off in M. Clukey's vehicle. Although M. Milner's residence was only "two streets over" from the gathering, Mr. Clukey drove Mr. Miner back to his vehicle parked at the convenience store, which was farther away. Pursuant to M. Clukey's deposition testimony, he did so "because that's where [Mr. Miner] wanted to go," and because M. Clukey "was still drunk [him]self." M. Clukey was admittedly aware that M. Miner was intoxicated at the time he brought him back to his vehicle. Assuming that Mr. Miner was either going home or to pick up some food, Mr. Clukey left the convenience store lot as Mr. Milner backed out of his parking spot. Mr. Clukey subsequently returned to the house gathering.[6]

---

3. Mr. Clukey testified in his deposition that he gave Mr. Milner "a couple bucks" to help facilitate the purchase, with the intent that the two would share the beer. We note that the age at which one may purchase an alcoholic beverage in this state is twenty-one years. *See* G.L.1956 § 3–8–6.

4. The plaintiff alleges that the hostess's inquiry was prompted by Mr. Milner's slip-and-fall in the pool deck area.

5. According to the hostess's witness statement to police, Mr. Clukey and Mr. Milner arrived at the house gathering "sometime between 11:30 [p.m.] and 12:00 [a.m.]" and stayed "no more than * * * 20 minutes." We note that in his deposition, Mr. Clukey estimated the pair's arrival at "probably close to 12:30, 12:45 [a.m.]"

6. According to Mr. Clukey, he made arrangements to be picked up at a nearby hardware store, where he left his vehicle, so he could return to the house gathering.

Mr. Milner's itinerary after leaving the convenience store parking lot is unknown. What is known, however, is that shortly before 1:30 a.m., Mr. Milner, traveling at a high-rate of speed, crossed the center line along Plainfield Pike in the Town of Scituate, Rhode Island, and collided head-on with a vehicle operated by the plaintiff's decedent in this case, Eldrick L. Johnson (Mr. Johnson). Mr. Milner was pronounced dead at the scene of the collision. His autopsy report indicated a blood-alcohol concentration (BAC) of 0.162 percent, which was just over twice the legal limit for operating a motor vehicle in this state.[7] Mr. Johnson, although alive at the time police responded to the scene, did not survive the accident and was pronounced dead on arrival at the hospital, leaving behind a wife and four minor children.

On August 26, 2005, plaintiff filed this wrongful-death action against Mr. Milner, his father William J. Milner (who owned the vehicle that Mr. Milner was driving), John Doe, and Allstate Insurance Company, the vehicle's insurer.[8] After the filing of two amended complaints, plaintiff filed a third amended complaint on August 7, 2008, naming Mr. Clukey and his parents as additional defendants in the action. Ultimately, all claims were resolved against Mr. Milner (deceased), William J. Milner, Allstate Insurance Company, John Doe, and Mr. Clukey's parents, leaving Mr. Clukey as the sole remaining defendant in this action.[9] The one claim set forth against Mr. Clukey, sounding in negligence, was premised on plaintiff's allegations that Mr. Clukey "knew or had reason to know that [Mr. Milner] was in an intoxicated state and was not fit to drive a motor vehicle," and therefore "owed a duty to all persons using the public highways, including [the] decedent * * * to exercise due and reasonable care." The plaintiff further alleged that Mr. Clukey breached this purported duty "by deciding to bring [Mr.] Milner back to [his] vehicle as opposed to [his] home when he knew or should have known that [Mr.] Milner would drive in an intoxicated state and was not fit to drive a motor vehicle," proximately causing the collision and resultant death of Mr. Johnson.[10]

On June 3, 2009, Mr. Clukey filed a motion for summary judgment, contending that plaintiff had failed to allege a duty recognized under either Rhode Island precedential case law or statutory pronouncement. Mr. Clukey argued that the duty alleged by plaintiff—one that places an affirmative obligation on an adult indi-

---

7. *See* G.L.1956 § 31–27–2, governing the operation of motor vehicles under the influence of liquor or drugs.

8. It appears that Mr. Milner, deceased at the time, was erroneously named in the initial complaint and was subsequently removed as a defendant.

9. The record indicates that plaintiff settled her claims with William J. Milner and Allstate Insurance Company prior to naming the Clukey defendants; however, neither a dismissal stipulation nor final judgment was ever filed attesting to such a settlement. Therefore, following the docketing of this appeal to this Court, we remanded the case to the Superior Court for entry of final judgment with respect to defendants William J. Milner, Allstate Insurance Company, and John Doe, which stipulation was accordingly filed on February 8, 2011. The parties had previously filed a dismissal stipulation as to Mr. Clukey's parents, Thomas M. Clukey and Donna Clukey, on March 17, 2009.

10. In her complaint, plaintiff alleges that Mr. Clukey was "the designated driver" on the night in question. We note that, although Mr. Clukey agreed to drive, he may not have acted as a "designated driver" in the strictest sense of the term, because the record is devoid of any evidence that he agreed to refrain from consuming alcohol that evening. *See Downs ex rel. Downs v. Bush*, 263 S.W.3d 812, 824 n. 12 (Tenn.2008) (A "designated driver" is " 'one who assumes the duty to remain sober for the purpose of driving others.' ").

vidual to prevent a third party from operating a vehicle while under the influence of alcohol—is not a duty that supports a cognizable claim under existing authority. In arguing the absence of duty, Mr. Clukey analogized the instant matter to those cases involving "social host liability," which cases (discussed *infra*) recognize a duty to a third party by a social host for injuries suffered at the hands of an intoxicated guest only when a "special relationship" exists between the host and the tortfeasor. Such a special relationship, Mr. Clukey contended, did not exist under the factual circumstances here. Thus, in his view, plaintiff was essentially urging the court to create a new cause of action, which would impose a new duty on the general public.

In opposing Mr. Clukey's summary judgment motion, plaintiff emphasized that she was not relying on a social-host-liability theory, but instead was grounding her contention on several alternate analyses by which the court could find a duty imposed upon Mr. Clukey. Primarily, plaintiff asked the hearing justice to perform the *ad hoc* approach set forth by this Court in *Banks v. Bowen's Landing Corp.*, 522 A.2d 1222 (R.I.1987), to determine whether Mr. Clukey had a duty to take reasonable measures to control Mr. Miner's conduct. The plaintiff likewise asked the court to consider the alleged voluntary assumption of a duty by Mr. Clukey.

During the parties' oral arguments in Superior Court on August 11, 2009, the hearing justice expressed numerous concerns about imposing a duty upon Mr. Clukey based on the facts of the case. She commented particularly on the scope of the proposed duty, how such a duty would be performed to conclusion, and the extent to which a person in Mr. Clukey's position would be liable. She highlighted that both Mr. Clukey and Mr. Milner were adults, each of whom consumed alcohol that eve-

ning, albeit under the legal age to do so, and further noted that "Mr. Milner was the one in control of his actions, not Mr. Clukey." Troubled as to how this alleged duty would be delineated, the hearing justice also questioned the parties' attorneys on how a jury would be instructed should the matter proceed to trial. She specifically struggled with the policy implications stemming from an imposition of the duty, observing that plaintiff was asking the court to declare "a designated driver's duty as a matter of law," and stressing that "it should be the [L]egislature's duty to debate and to determine what the policy of the state needs to be."

After considering the parties' oral arguments and supporting memoranda, and viewing the facts in the light most favorable to plaintiff, the nonmoving party, the hearing justice issued a bench decision on Mr. Clukey's motion. Declining to impose a duty of care as urged by plaintiff, the hearing justice emphasized the uncertainty of the duty that would be placed on "friends, acquaintances, public transportation providers and other people who at some point in time drive around someone who is intoxicated." She deemed the issue presented by this case to be a "broad public policy decision" best left to the Legislature given the "serious implications" that were presented, citing this Court's deference to the General Assembly in social-host-liability cases as support for her judicial restraint. Accordingly, the hearing justice granted Mr. Clukey's motion for summary judgment based on the failure of plaintiff's negligence claim as a matter of law.

Final judgment in favor of Mr. Clukey was entered on September 3, 2009. The plaintiff timely filed her notice of appeal on September 17, 2009.

## II

### Issues on Appeal

On appeal, plaintiff challenges the hearing justice's determination that no duty existed under either Rhode Island case law or statutory law to impose liability upon Mr. Clukey in this case, consequently deferring to the Legislature's duty-creating authority. The plaintiff contends that a duty did indeed exist "under the common law theory of negligence," separate and apart from the duty (or lack of duty) imposed in social-host-liability cases. To support this contention, plaintiff presents what she perceives to be "four distinct theories of liability" in her appeal: (1) liability resulting from a cognizable duty ascertained from a consideration of the factors set forth in *Banks*, 522 A.2d at 1225, discussed *infra;* (2) liability based on a "special relationship" between Mr. Clukey and Mr. Milner as set forth in the Restatement (Second) *Torts* § 315 (1965) and Rhode Island case law; (3) consequent liability based on Mr. Clukey's purported assumption of a duty to prevent Mr. Milner from driving under the influence; and (4) liability stemming from Mr. Clukey's alleged "substantial assistance" of Mr. Miner's intoxicated operation of a motor vehicle. Based on these proposed avenues of liability, plaintiff urges this Court to unbridle the judicial restraint employed by the hearing justice in her decision and find a duty in this case as a matter of law.

In countering, Mr. Clukey avers that whether the facts of this case give rise to its classification as one involving social-host liability is immaterial to this Court's consideration of plaintiff's appeal. He notes that "social-host" cases fundamentally involve claims of negligence, which require that a plaintiff establish a recognized duty—a hurdle that Mr. Clukey contends plaintiff cannot surmount in this case based on existing authority. Although ac-knowledging that liability may be imposed in cases in which a "special relationship" is determined, Mr. Clukey maintains that no such special relationship existed between him and Mr. Milner. In seeking this Court's affirmance, Mr. Clukey also emphasizes the public policy concerns associated with imposing an obligation upon an adult to prevent another adult from operating a vehicle under the influence of alcohol, and particularly the difficulties in defining the scope and extent of such a duty.

## III

### Standard of Review

This Court reviews *de novo* a hearing justice's grant of a motion for summary judgment. *Henderson v. Nationwide Insurance Co.*, 35 A.3d 902, 905 (R.I.2012) (citing *Zanni v. Voccola*, 13 A.3d 1068, 1070 (R.I.2011)). "We will affirm the grant of summary judgment only '[i]f we conclude, after viewing the evidence in the light most favorable to the nonmoving party, that there is no genuine issue of material fact to be decided and that the moving party is entitled to judgment as a matter of law * * *.'" *Empire Acquisition Group, LLC v. Atlantic Mortgage Co.*, 35 A.3d 878, 882 (R.I.2012) (quoting *Pereira v. Fitzgerald*, 21 A.3d 369, 372 (R.I.2011)). "The party opposing summary judgment bears the burden of proving, by competent evidence, the existence of facts in dispute." *Lynch v. Spirit Rent–A–Car, Inc.*, 965 A.2d 417, 424 (R.I.2009) (quoting *Cullen v. Lincoln Town Council*, 960 A.2d 246, 248 (R.I.2008)). Here, the question presently before this Court is purely one of law; "[t]his Court also uses a *de novo* standard to review a [hearing] justice's rulings on questions of law." *Waterman v. Caprio*, 983 A.2d 841, 844 (R.I.2009) (citing *Hilley v. Lawrence*, 972 A.2d 643, 649 (R.I.2009)).

## IV

### Discussion

 Even in the face of tragic consequences, liability for alleged negligent conduct cannot attach to a defendant absent a recognized duty of care. *See Selwyn v. Ward*, 879 A.2d 882, 886 (R.I.2005). It is not until a legal duty is established that a plaintiff is entitled to a factual determination on the enduring elements of his or her negligence claim—breach of duty, proximate causation, and actual loss or damage. *See id.* (citing *Terry v. Central Auto Radiators, Inc.*, 732 A.2d 713, 718 (R.I.1999)); *see also Ouch v. Khea*, 963 A.2d 630, 633 (R.I.2009) ("Only when a party properly overcomes the duty hurdle in a negligence action is he or she entitled to a factual determination on each of the remaining elements * * *."). "If the court finds that no duty exists, 'the trier of fact has nothing to consider and a motion for summary judgment must be granted.'" *Berardis v. Louangxay*, 969 A.2d 1288, 1291 (R.I.2009) (quoting *Banks*, 522 A.2d at 1225).

 It is well settled that in this jurisdiction the determination of "[w]hether a defendant is under a legal duty in a given case is a question of law" and, that the assessment of such is conducted on a "case-by-case basis." *Willis v. Omar*, 954 A.2d 126, 129, 130 (R.I.2008) (citing *Martin v. Marciano*, 871 A.2d 911, 915 (R.I. 2005)). In conducting this analysis, we examine "all relevant factors, including the relationship of the parties, the scope and burden of the obligation to be imposed upon the defendant, public policy considerations, and notions of fairness." *Volpe v. Gallagher*, 821 A.2d 699, 705 (R.I.2003) (quoting *Hennessey v. Pyne*, 694 A.2d 691, 697 (R.I.1997)); *see also Banks*, 522 A.2d at 1225 (As "[n]o clear-cut rule exists to determine whether a duty is in fact present in a particular case[,]" the Court considers several factors "to aid in that determination.").

## A

### Rhode Island Case Law

 As acknowledged by both parties, in cases involving social hosts, "[w]e consistently have refused" to recognize a duty owed by a host to third parties for injuries caused by an intoxicated guest who consumed alcohol at the host's premises, absent "a duty-triggering special relationship." *Willis*, 954 A.2d at 130. Here, however, the circumstances of the action do not cleanly align with the factual template generally associated with social-host-liability cases. Despite the underlying facts concerning alcohol consumption in this case, Mr. Clukey was not socially hosting Mr. Milner at his premises. Nevertheless, the analyses and reasoning underpinning our line of social-host-liability cases provide invaluable guidance in ruminating and resolving the matter now before this Court. In a similar fashion, our past precedent addressing the implications of a special relationship between the parties in determining a duty illumines the path we now embark upon.

In 1995, this Court encountered the concept of social-host liability for the first time in *Ferreira v. Strack*, 652 A.2d 965 (R.I.1995). In *Ferreira*, two pedestrians injured by an intoxicated driver brought suit against the hosts of a party at which the driver had consumed alcohol on the night of the accident. The social hosts successfully moved for summary judgment in Superior Court on the theory that they owed no duty to the plaintiffs to prevent the intoxicated guest from operating his vehicle that evening. The plaintiffs appealed and contended that because the hosts actually or constructively knew that the driver was intoxicated and intended on operating a motor vehicle, they owed a duty of care to the general public to prevent him from doing so. *Id.* at 967.

On appeal, we considered the specific question of "whether there exists a duty of care owed by a defendant social host to an innocent third party who suffers injuries as a result of the negligent operation of a motor vehicle by an adult guest if the negligence is caused by the guest's intoxication." *Ferreira*, 652 A.2d at 967. In arriving at the answer to this question, we acknowledged that this Court had "never adopted the principle that a social host owes a duty to a third person injured by an intoxicated person who has obtained intoxicating liquor at his or her home," *id.* at 968, and we also noted that the majority of jurisdictions at that time were "reluctant to impose liability on social hosts based on the basis of negligence principles alone, without the support of express legislative policy." *Id.* Reviewing the rationales employed by other jurisdictions in declining to impose such a duty, this Court likewise deferred to the Legislature, holding that

> "[t]he imposition of liability upon social hosts for the torts of guests has such serious implications that any action taken should be taken by the Legislature after careful investigation, scrutiny, and debate. It is abundantly clear that greater legislative resources and the opportunity for broad public input would more readily enable the Legislature to fashion an appropriate remedy to deal with the scope and severity of this problem." *Id.*

We further emphasized that

> "[p]reventing the future loss of innocent lives because of intoxicated drivers requires both legislative and judicial action in a combined effort to win the war against the devastating consequences of drunk driving. The Legislature must set out the duties and responsibilities of various segments of our society within these social situations, and the courts must stringently enforce those duties and responsibilities." *Id.* at 970.

Finding no duty owed to the plaintiffs by the defendant-hosts under the facts of that case, this Court affirmed the judgment of the Superior Court.[11] *Id.*

Ten years later, in *Martin v. Marciano*, 871 A.2d 911 (R.I.2005), this Court was presented with another alcohol consumption/premises liability case, this time involving injury to the plaintiff-guest at the hands of an assailant who showed up at the home of a social host.[12] However, the factual circumstances in *Martin* extracted the case from the constraints instilled in *Ferreira*, because the defendant adult host provided alcohol to underage drinkers, including the injured plaintiff. *Id.* at 916. Noting that, although "a landowner [generally] has no duty to protect another from harm caused by the dangerous or illegal acts of a third party[,] * * * [a]n exception to this rule exists, however, when a plaintiff and a defendant bear a special relationship to each other." *Id.* at 915 (citing *Luoni v. Berube*, 431 Mass. 729, 729 N.E.2d 1108, 1111 (2000)). Finding the facts of the case to give rise to a special relationship between the injured plaintiff and the defendant-host, we held that parent-hosts who provide alcohol to underage guests indeed have "a duty to take reasonable steps to protect their guests from injury * * *." *Id.* at 916. This Court further distinguished the matter from *Ferreira*, reasoning that "[t]he 'serious implications' that counseled in favor of judicial

---

**11.** *See also Marty v. Garcia*, 667 A.2d 282 (R.I.1995), in which this Court again declined to adopt the doctrine of social-host liability, citing to its opinion in *Ferreira* issued less than a year earlier.

**12.** In *Martin v. Marciano*, 871 A.2d 911, 914 (R.I.2005), the plaintiff was attacked with a baseball bat while attending a high school graduation party that the defendant-parent hosted for her daughter.

restraint in *Ferreira* [were] noticeably absent" and that on the contrary, existing public policy[13] favored "burdening parent-hosts who provide alcohol to underage guests with [such] a duty." *Martin*, 871 A.2d at 916 (quoting *Ferreira*, 652 A.2d at 968). Although the defendant-host mounted a challenge based on a lack of foreseeability of the injury, this Court determined that "in the context of [the] defendant's duty, it was generally foreseeable that one of her underage guests could have been the victim of an attack while attending the party." *Id.* at 917.

Following our opinion in *Martin*, we were again petitioned to ponder a place for social-host liability within our jurisprudence in *Willis*. The negligence claim set forth by the injured plaintiff, Willis, arose from the alleged negligent service of alcohol by the defendant-hosts to Willis and her boyfriend, both of drinking age, while at the hosts' residence. *Willis*, 954 A.2d at 127–28. In Willis's view, this conduct led to the single-car collision later that evening in which she was injured as a passenger in her boyfriend's vehicle. *Id.* The defendant-hosts filed a successful motion for summary judgment premised on a lack-of-duty argument. *Id.* at 128–29. In granting the motion, the hearing justice emphasized "that Rhode Island ha[d] not embraced social-host liability for drunk-driving casualties, in the absence of an accompanying special relationship." *Id.* at 129 (citing *Ferreira*, 652 A.2d at 967).

In affirming the hearing justice's grant of summary judgment, we discerned no extant special relationship—requisite to a finding of duty—upon review of the record. *Willis*, 954 A.2d at 130. Likening Willis's case to that in *Ferreira*, and distinguishing it from special relationship cases, such as *Martin*, this Court declined to overturn settled precedent by adopting the general social-host theory of liability in furtherance of creating a new cause of action. *Willis*, 954 A.2d at 130–31. As in *Ferreira*, we underscored in *Willis* that "[t]he issue of liability *vel non* for social hosts whose guests cause harm is a matter that belongs in the Legislature." *Willis*, 954 A.2d at 131.

In *Willis*, 954 A.2d at 129–30, this Court turned to its opinions in both *Martin* and in *Volpe*, in conducting the special relationship inquiry. *Volpe*, while not a social-host case, did focus on premises liability. *Volpe*, 821 A.2d at 705. In *Volpe*, the defendant homeowner was sued based on allegations that she negligently allowed her adult son, who was mentally ill, to store guns and ammunition on her property. *Id.* at 702. The son used one of the firearms to shoot and kill his next-door neighbor while the neighbor trimmed a hedge along the property boundary. *Id.* at 703. Although a jury returned a verdict deeming the defendant to have been negligent by allowing her "mentally disturbed, paranoid, and delusional" son to store firearms and ammunition on her property, the trial justice ultimately granted the defendant's motion for a new trial. *Id.* at 704. In so doing, the trial justice reasoned that she had mistakenly permitted the case to go to the jury because, in her view, the defendant "owed no legal duty to the neighboring victim because she could not have foreseen that her son would use any of [the] firearms to murder him—at least without any evidence of similar previous

---

**13.** Citing numerous statutory enactments designed by the General Assembly to prohibit the purchase, consumption, and transportation of alcohol by those under the age of twenty-one and to restrict the provision of alcohol by adults to underage drinkers, this Court observed that "[t]he imposition of a higher standard of care in this case may provide a valuable disincentive for adults who might otherwise be willing to provide alcohol to minors, or to turn a blind eye to its consumption on their premises." *Martin*, 871 A.2d at 916.

incidents or a violent history to signal her that he was capable of such an act." *Id.*

Upon review, a majority of this Court reversed the trial justice's grant of the new-trial motion, holding that, based on the circumstances at hand, the defendant property owner did indeed have "a duty to exercise reasonable care so to control [her son's] conduct * * * as to prevent him from intentionally harming others or from so conducting himself as to create an unreasonable risk of bodily harm to them[.]" *Volpe*, 821 A.2d at 709 (quoting Restatement (Second) *Torts* § 318 at 126–27 (1965)). In arriving at this conclusion, this Court relied on both "a landowner's traditional liability to visitors and to those outside the property for maintaining dangerous conditions on their land," *id.* at 706, as well as a land possessor's " 'duty to exercise reasonable care for the protection of others' " that arises " 'between the possessor of land and those allowed on the land because of the possessor's power of control over those allowed to enter.' " *Id.* (quoting *Chavez v. Torres*, 128 N.M. 171, 991 P.2d 1, 5 (Ct.App.1999)). The latter theory is based on the Restatement (Second) *Torts* § 318 at 126–27, entitled "Duty of Possessor of Land or Chattels to Control Conduct of Licensee," and reads as follows:

> "If the actor permits a third person to use land or chattels in his possession otherwise than as a servant, he is, if present, under a duty to exercise reasonable care so to control the conduct of the third person as to prevent him from intentionally harming others or from so conducting himself as to create an unreasonable risk of bodily harm to them, if the actor
>
> "(a) knows or has reason to know that he has the ability to control the third person, and
>
> "(b) knows or should know of the necessity and opportunity for exercising such control."

In adopting this theory of liability, we emphasized in *Volpe* that such a duty is conditional and "does not create strict liability for those possessors of property who permit third parties to conduct an activity on their property that creates an unreasonable risk of bodily harm to others * * *." *Volpe*, 821 A.2d at 706. Determining that the defendant in *Volpe* met these conditions, we held that a special relationship indeed existed between the defendant and her neighbor that imposed upon the defendant a duty to control the conduct of her adult son.[14,15] *See id.* at 709.

This Court next confronted the special-relationship question in *Santana v. Rainbow Cleaners, Inc.*, 969 A.2d 653 (R.I. 2009), in which an injured plaintiff sued a mental health center, alleging that the center was negligent by not seeking to commit the mentally-disturbed patient who struck her with a crowbar. *Id.* at 654–55. The plaintiff maintained that the center was liable "because it knew or should have known that [the patient] was an individual whose continued unsupervised presence in the community would create an imminent

---

**14.** The duty-triggering facts in *Volpe* included the defendant's knowledge of her son's severe mental illness, as well as her actual or constructive knowledge "that she had the ability to control her son's conduct on her property * * *." *Volpe v. Gallagher*, 821 A.2d 699, 709 (R.I.2003). We also noted that "the burden of exercising control in [that] case by effecting removal of the guns was a relatively light and inexpensive one to implement." *Id.*

**15.** The dissenting opinion in *Volpe* disagreed with the imposition of a duty based on the facts of the case. *Volpe*, 821 A.2d at 720 (Shea, J. dissenting). The dissenting justice explained that, in his view, "[a]lthough couched in a theory of landowner liability, the majority effectively ha[d] created a new cause of action allowing tort liability for parents who fail to control the conduct of their adult offspring[,]" without the support of the General Assembly. *Id.*

likelihood of serious harm by reason of mental disability * * *." *Id.* at 656. Arguing that it had no duty to exercise control over the patient to prevent him from committing an act of violence, the center successfully moved for summary judgment in the Superior Court. *Id.* at 656–57.

On appeal, this Court stated that, although "[t]here is ordinarily no duty to control a third party's conduct to prevent harm to another individual[,] [t]he law * * * has recognized an exception to this general rule when a defendant has a special relationship with either the person whose conduct needs to be controlled or with the intended victim of the conduct." *Santana,* 969 A.2d at 658. We noted that this exception is reflected in the Restatement (Second) *Torts* § 315 at 122, which states that

> "There is no duty so to control the conduct of a third person as to prevent him from causing physical harm to another unless
>
> > "(a) a special relation exists between the actor and the third person which imposes a duty upon the actor to control the third person's conduct, or
> >
> > "(b) a special relation exists between the actor and the other which gives to the other a right to protection."

Gleaning no evidence from the record that would show that the center had the ability or opportunity to control the patient, we concluded that no special relationship between the two existed based on the facts before us. *Santana,* 969 A.2d at 655–56. Citing the lack of special relationship, in conjunction with foreseeability and public policy concerns, this Court found no duty on the part of the center and affirmed the grant of summary judgment. *Id.* at 666–67.

The foregoing authority illustrates the fact-specific and intricate scrutiny this Court must apply when encountered with cases involving a defendant's alleged failure to control the tortious conduct of a third party, particularly when the consumption of alcohol is involved. The matter presently before us poses a factual pattern that reflects certain circumstances and concerns considered in our prior social-host and special-relationship opinions in an almost hybrid fashion. In light of this, the parties rely on both types of cases to support their respective causes. Notably absent from this case, however, is the fundamental theme of premises liability present in cases like *Martin* and *Volpe.* Nevertheless, amid the fog of theories and principles proffered by the parties in this appeal, what is clear is that the finding of a duty in this case rests largely upon whether a special relationship existed between Mr. Clukey and Mr. Milner, between Mr. Clukey and Mr. Johnson, or neither at all.

**B**

**Duty Analysis**

 As this Court has stated, "no clear-cut formula for creation of a duty exists that can be mechanically applied to each and every negligence case." *Santana,* 969 A.2d at 664 (quoting *Kenney Manufacturing Co. v. Starkweather & Shepley, Inc.,* 643 A.2d 203, 206 (R.I.1994)). For that reason, we carry out "an *ad hoc* approach that 'turns on the particular facts and circumstances of a given case[.]'" *Ouch,* 963 A.2d at 633 (quoting *Benaski v. Weinberg,* 899 A.2d 499, 502 (R.I.2006)). As discussed, this particularized practice encompasses the consideration of several factors, including "(1) the foreseeability of harm to the plaintiff, (2) the degree of certainty that the plaintiff suffered an injury, (3) the closeness of connection between the defendant's conduct and the injury suffered, (4) the policy of preventing future

harm, and (5) the extent of the burden to the defendant and the consequences to the community for imposing a duty to exercise care with resulting liability for breach." *Ferreira*, 652 A.2d at 967–68 (quoting *Banks*, 522 A.2d at 1225). The "relationship between the parties" is likewise considered in our duty analysis. *Selwyn*, 879 A.2d at 887 (quoting *Martin*, 871 A.2d at 915).

## 1

### Nature of the Relationship

 As emphasized in *Santana*, there is generally no duty to control the conduct of a third party to prevent injury to another person unless "a defendant has a special relationship with either the person whose conduct needs to be controlled or with the intended victim of the conduct." *Santana*, 969 A.2d at 658; *see also* Restatement (Second) *Torts* § 315. In both *Volpe* and *Martin*, the existing special relationships emanated primarily from each defendant's status as a property owner—under § 318 of the Restatement (Second) *Torts*, "[a] special relationship * * * may arise between the possessor of land and those allowed on the land because of the possessor's power of control over those allowed to enter." *Volpe*, 821 A.2d at 706 (quoting *Chavez*, 991 P.2d at 5 and citing W. Page Keeton et al., *Prosser and Keeton on the*

*Law of Torts* § 57 at 392 (5th ed.1984)). Here, however, possession of land is not a factor. Cognizant of this circumstance, plaintiff maintains that a special relationship between Mr. Clukey and Mr. Milner instead arose from "[Mr.] Clukey's knowledge of [Mr.] Milner's practice of drinking to excess prior to[ [16]] and on August 12, 2005, [Mr.] Clukey's control over [Mr.] Milner's access to his automobile that night, and [Mr.] Clukey's controlling influence over [Mr.] Milner's actions."

After careful examination of the record, and viewing all evidence in favor of the plaintiff, we conclude that the facts of this case do not sufficiently give rise to a special relationship between Mr. Clukey and Mr. Milner. Despite Mr. Clukey's knowledge of both Mr. Milner's past social drinking habits and current intoxicated state on the evening in question, the facts do not indicate that Mr. Milner was under Mr. Clukey's charge or control. This case is distinguishable from *Martin*, in that Mr. Clukey, an underage drinker himself, was not an adult who furnished alcohol to Mr. Milner.[17] Nor was such alcohol consumption induced at a premises controlled by Mr. Clukey. Mr. Clukey did not have the ability to regulate Mr. Milner's drinking, nor could he control Mr. Milner's actions after he safely returned him to his vehicle at the convenience store.[18] *See Santana*,

---

16. To support this proposition, plaintiff relies on Mr. Clukey's deposition testimony that Mr. Milner would get "drunk" when the two drank together socially "maybe once a week," and that "somebody would drive [Mr. Milner's] car" when he became intoxicated.

17. "Furthermore, we have held that, even if minors unlawfully are furnished with alcoholic beverages, this act alone is insufficient to trigger a special relationship, if the resultant risk of injury is not foreseeable." *Willis v. Omar*, 954 A.2d 126, 130 (R.I.2008) (citing *Selwyn v. Ward*, 879 A.2d 882, 888–89 (R.I. 2005) (vendor who illegally sold alcohol to minors was not liable because the alcohol was

used in an unforeseeable manner when another minor deliberately ignited it)).

18. Although not characterized as such, we note that this facet of plaintiff's argument echoes the sentiment set forth in the Restatement (Second) *Torts* § 319 at 129 (1965)— entitled "Duty of Those in Charge of Person Having Dangerous Propensities"—which states that "[o]ne who takes charge of a third person whom he knows or should know to be likely to cause bodily harm to others if not controlled is under a duty to exercise reasonable care to control the third person to prevent him from doing such harm." However, this theory of liability is typically asserted in

969 A.2d at 665 (citing *Hasenei v. United States*, 541 F.Supp. 999, 1009 (D.Md.1982) ("a special relationship must include the right or the ability to control the conduct of another")). Under the facts of this case, Mr. Clukey's agreement to bring Mr. Milner back to his vehicle that evening did not constitute an exercise of control equivalent to the custodial degree required to find a special relationship. *See McGee By and Through McGee v. Chalfant*, 248 Kan. 434, 806 P.2d 980, 985 (1991) (agreement to transport intoxicated individual to his automobile "d[id] not constitute such an affirmative act as to amount to the exercise of custody or control over [that individual]" despite knowledge of his intoxication).

Despite the lack of a special relationship between Mr. Clukey and Mr. Milner, a duty to control the conduct of Mr. Milner may have been imposed upon Mr. Clukey if a special relationship existed between him and Mr. Johnson, giving Mr. Johnson "a right to protection." Restatement (Second) *Torts* § 315. As explained in comment. *c.* to § 315 of the restatement, "[t]he relations between the actor and the other which require the actor to control the conduct of third persons for the protection of the other are stated in §§ 314A and 320." The Restatement (Second) *Torts* § 314A (1965) designates the following special relations giving rise to a duty to aid or protect: (1) common carrier/passenger; (2) innkeeper/guests; (3) possessor of land that holds the land open to the public/member of the public; and (4) legal or voluntary custodian/ward. These relations create a special responsibility and remove such cases from the general rule, set forth in the Restatement (Second) *Torts* § 314 at 116 (1965), that "[t]he fact that the actor

realizes or should realize that action on his [or her] part is necessary for another's aid or protection does not of itself impose upon him [or her] a duty to take such action." *See* Restatement (Second) *Torts* § 315; *see also* § 314A cmt. *b.* Although this list is not intended to be exclusive, it is clear that any "relationship" between Mr. Clukey and Mr. Johnson is far removed from these categories. *See* Restatement (Second) *Torts* § 314A cmt. *b.*

Equally inapplicable is § 320, which addresses the duty of persons having custody of another to control the conduct of third persons. "[T]his Section is applicable to a sheriff or peace officer, a jailer or warden of a penal institution, officials in charge of a state [or private] asylum or hospital for the criminally insane, or to teachers or other persons in charge of a public [or private] school." Restatement (Second) *Torts* § 320 cmt. *a.* at 130 (1965). Based on these principles, this Court concludes that no special relationship existed between Mr. Clukey (the driver who brought Mr. Milner to his vehicle) and Mr. Johnson (the victim of Mr. Milner's tortious conduct).

Because no special relationship existed between the parties in this case to support a duty by Mr. Clukey to control Mr. Milner's conduct on August 12, 2005, to prevent physical harm to Mr. Johnson, plaintiff's argument based on this theory must fail.

## 2

### Gratuitous Undertaking

Here, plaintiff maintains that, even if a special relationship is lacking in this case, Mr. Clukey voluntarily assumed the duty

---

cases involving "professional custodians with special competence to control the behavior of those in their charge[,]" *Kaminski v. Town of Fairfield*, 216 Conn. 29, 578 A.2d 1048, 1051 (1990), and has been unsuccessfully proffered as a justification for imposing liability on a defendant for failing to protect the public from an intoxicated driver. *See, e.g., Stepnes v. Adams*, 452 N.W.2d 256, 259 (Minn.Ct.App. 1990).

to prevent Mr. Milner from operating his motor vehicle, and then breached this alleged duty by failing to drive him home. Indeed, this precise theory was recognized in *Chalfant,* 806 P.2d at 983, in which the Supreme Court of Kansas stated that "[w]hen the existence of a special relationship is lacking between an actor and another, the actor may still be liable to third persons when he negligently performs an undertaking to render services to another which he should recognize as necessary for the protection of third persons." *Id.* Both the Supreme Court of Kansas and plaintiff extract this principle from the standard set forth in the Restatement (Second) *Torts* § 324A at 142 (1965), which provides as follows:

> "One who undertakes, gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection of a third person or his things, *is subject to liability to the third person* for physical harm resulting from his failure to exercise reasonable care to protect his undertaking, if
>
> "(a) his failure to exercise reasonable care increases the risk of such harm, or
>
> "(b) he has undertaken to perform a duty owed by the other to the third person, or

"(c) the harm is suffered because of reliance of the other or the third person upon the undertaking." (Emphasis added.)

Section 324A tracks the language of § 323 of the restatement, which the recipient of the undertaken services. *See* Restatement (Second) *Torts* § 323 (1965).

This Court has "recognized the doctrine that one who assumes a duty to perform an act must do so with reasonable care whether or not that person had an obligation to perform the act or repairs prior to assuming the duty." *Izen v. Winoker,* 589 A.2d 824, 828 (R.I.1991) (citing *Therrien v. First National Stores, Inc.,* 63 R.I. 44, 51, 6 A.2d 731, 734 (1939)); *see also Davis v. New England Pest Control Co.,* 576 A.2d 1240, 1242 (R.I.1990) ("Even one who assumes to act gratuitously, may become subject to the duty of acting carefully if he acts at all." (citing *Security National Bank v. Lish,* 311 A.2d 833, 834 (D.C.App.1973))). However, this Court has not adopted the more "relaxed" standards set forth in §§ 323 and 324 of the restatement, which speak also to the issue of proximate causation, and we decline to do so in the context of this appeal.[19] *See Contois v. Town of West Warwick,* 865 A.2d 1019, 1024 n. 7 (R.I.2004) ("The Restatement standard [under § 323] is extremely relaxed, allowing for recovery

---

**19.** As noted by the United States District Court for the District of Rhode Island in *Gray v. Derderian,* 448 F.Supp.2d 351, 360 (D.R.I. 2005), "[the] Court is aware of no case where the Rhode Island Supreme Court has adopted Restatement (Second) of Torts § 324A as the law of this state. As a result, this Court cannot conclude that Restatement (Second) of Torts § 324A is the established law in Rhode Island." The District Court had earlier concluded the same in regard to § 323, stating that

> "it is not at all clear that the theory of § 323 has been adopted in Rhode Island. It is true that '[e]ven one who assumes to act gratuitously, may become subject to the

duty of acting carefully if he acts at all.' *Davis v. New England Pest Control Co.,* 576 A.2d 1240, 1242 (R.I.1990). This statement, however, simply sets forth a particular situation in which a legal duty may be imposed. It does not extend to an adoption of the relaxed approach to problems of proximate cause which § 323 appears to dictate. [The plaintiff] cites no case in which the Rhode Island Supreme Court has substituted notions of reliance and/or increased harm for traditional rules of proximate cause, and this Court seriously doubts that such a case is forthcoming." *Travelers Insurance Co. v. Priority Business Forms, Inc.,* 11 F.Supp.2d 194, 202 (D.R.I.1998).

when a defendant's negligence increased the risk of harm by any degree."). Thus, we will not review plaintiff's voluntary-assumption-of-duty argument under the standard of § 324A as urged by plaintiff, but instead we proceed to do so through the lens of our existing case law.

In *Buszta v. Souther,* 102 R.I. 609, 232 A.2d 396 (1967), this Court tackled the question of whether an automobile service-station operator who undertook an automobile inspection of an owner's vehicle had a duty to third parties whose injuries were attributable to negligently made repairs, notwithstanding a lack of privity between the injured third party and the inspector. *Id.* at 611–12, 232 A.2d at 397–98. In resolving this question, we held

> "that where a party to a contract undertakes to render a service or perform an obligation and the circumstances involved in the undertaking make it clear that there is an obvious and unreasonable risk of harm or injury to outsiders if he does not exercise due care in fulfilling the contract, an obligation arises *by law* and is imposed upon the contracting party to exercise that amount of care and skill reasonably required by the facts and commensurate with the risk presented." *Id.* at 613–14, 232 A.2d at 399.

We further reasoned that

> "[w]e can perceive no difference between [the] defendant who agreed to inspect the employer's automobile and one who might have agreed to repair the vehicle. It has been held that a person who contracts to make repairs must exercise reasonable care in doing so, and although elements of contract may be involved, the repairer is liable in tort to third persons for injuries to such persons which are attributable to negligently made repairs." *Id.* at 614, 232 A.2d at 399.

The case at hand is distinguishable from that considered in *Buszta* in regard to the nature of the undertakings at issue. The performance of an inspection service by a certified inspection station, upon which inspections both vehicle owners and highway users rely, is not analogous to Mr. Clukey's personal transportation of Mr. Milner over the course of an evening. Moreover, the record reveals that Mr. Clukey completed the task that he undertook— shuttling Mr. Milner between locales and returning him to his vehicle at the end of the evening. Though Mr. Clukey had the alternative options of driving Mr. Milner to his residence or preventing him from operating his vehicle in some other fashion, such was not the obligation that Mr. Clukey agreed to perform. Therefore, we hold that the facts of this case do not support the imposition of a duty upon Mr. Clukey owed to Mr. Johnson, or public roadway users in general, based on the theory of negligent performance of a voluntarily-assumed duty.

We note that plaintiff has directed this Court to cases in other jurisdictions that have considered an alleged assumption of duty owed by a volunteering "designated driver" to the public. We further observe that jurisprudence concerning "designated driver" liability in this country is particularly limited. The most recent case cited by plaintiff is a trial court decision, *White v. Sabatino,* 415 F.Supp.2d 1163, 1177 (D.Haw.2006), in which the United States District Court for the District of Hawaii "conclude[d] that a designated driver undertakes a common law duty to a third party under the Section 324A framework [of the Restatement (Second) *Torts* ]." However, that case limited the imposition of such a duty in the absence of any evidence indicating that performance of the "designated driver" duty had been undertaken, particularly in "circumstances where parties may have consumed alco-

hol." *White*, 415 F.Supp.2d at 1177. Prior to *White*, the Supreme Court of Alaska likewise recognized a "designated driver" duty based on the standard set forth in § 324A, particularly subsection (a), in *Mulvihill v. Union Oil Co. of California*, 859 P.2d 1310 (Alaska 1993). That court, however, ultimately determined that the "designated driver" had discharged his duty upon bringing the intoxicated passenger home, which was the agreed-upon course of action, and thus could not be liable for the passenger's operation of a vehicle subsequent to the drop-off. *Id.* at 1314. Importantly, the Supreme Court of Alaska emphasized that imposing such liability would mean that "every designated driver who agreed to drive a friend home after a night of drinking would risk liability if that friend chose to drive after the designated driver left. Such a result would undermine society's well-founded desire to encourage sober people to volunteer to drive their intoxicated friends home." *Id.*

Though mindful of these decisions, we emphasize that this Court has not adopted § 324A, and we conclude that our legal philosophy more appropriately aligns with that of jurisdictions declining to impose a duty upon drivers to prevent the tortious conduct of an intoxicated passenger, discussed *infra.*

### 3

### Foreseeability

In addition to the consideration of the relationships between the parties in this case, this Court contemplates other factors in its duty analysis, including the foreseeability of harm to Mr. Johnson based on Mr. Clukey's conduct. Here, plaintiff argues that the foreseeability of harm to Mr. Johnson was apparent based on Mr. Clukey's "failure to take reasonable measures to prevent [Mr.] Milner from operating a motor vehicle while intoxicated." The

plaintiff contends that because Mr. Clukey "dropped off an intoxicated [Mr.] Milner at his automobile and essentially forced [him] to drive himself," the "risk to the public at large" was reasonably foreseeable and predictable.

■■ "As it pertains to the determination of duty, the foreseeability inquiry considers generally whether 'the category of negligent conduct at issue is sufficiently likely to result in the kind of harm experienced that liability may appropriately be imposed on the negligent party.'" *Martin*, 871 A.2d at 917 (quoting *Banks*, 522 A.2d at 1226–27). It would be imprudent to suggest that a driver would not reasonably perceive the risk of injury to other roadway users by returning an intoxicated individual to his or her motor vehicle. However, we have oft recognized "that foreseeability of injury does not, in and of itself, give rise to a duty." *Ferreira v. Strack*, 636 A.2d 682, 688 n. 4 (R.I.1994) (citing *D'Ambra v. United States*, 114 R.I. 643, 650–51, 338 A.2d 524, 528 (1975)); *see also Santana*, 969 A.2d at 666 ("Foreseeability alone does not create a duty * * *."). "[T]he question is not simply whether a[n] * * * event is foreseeable, but whether a *duty* exists to take measures to guard against it." *Ferreira*, 636 A.2d at 688 n. 4 (quoting *Goldberg v. Housing Authority of Newark*, 38 N.J. 578, 186 A.2d 291, 293 (1962)). Thus, we consider the foreseeability issue in tandem with all factors germane to the duty analysis.

### 4

### Closeness of Connection

In considering the closeness of the connection between Mr. Clukey's alleged negligent conduct (not preventing Mr. Milner from operating his vehicle) and Mr. Johnson's untimely death, we are obliged to stress the voluntary and independent na-

ture of Mr. Milner's decision to drive upon his return to the convenience store. *See Banks*, 522 A.2d at 1225 (connection between defendant's conduct in not posting warning signs and plaintiff's injury caused by his voluntarily diving into harbor was not close). Moreover, the record reflects that a significant amount of time passed between Mr. Clukey's drop-off of Mr. Milner at the convenience store parking lot and the fatal collision.[20] Such voluntary action on the part of Mr. Milner, considered in conjunction with the lack of temporal closeness of events, certainly strains any close connection perceived in this case.

### 5

### Extent of Burden

As noted by the hearing justice in her bench decision, imposing a duty upon an adult driver to prevent the intoxicated adult that he or she has agreed to transport from operating a vehicle, or causing other injury, places an "uncertain duty" upon friends, co-workers, acquaintances and even public transportation providers. We agree with this astute observation by the hearing justice. Defining the scope of such a duty escapes practicality, particularly in light of the innumerable factual nuances pervading this species of circumstance. Undoubtedly, questions of duration, adequacy of action, and subjectivity arise in considering the imposition of such a duty. When does the duty conclude? How assertive an attempt must one make to prevent the subsequent injurious con-

duct of an intoxicated passenger upon drop-off? How is a driver to gauge the passenger's level of inebriation? These are mere examples of the myriad of consequent inquiries each member of the community would have to consider before extending a friendly offer of transportation to an individual who has consumed alcohol prior to the fulfillment of that overture. Accordingly, we construe the potential burden far too onerous to impose upon Mr. Clukey or others similarly situated.

Such concerns have been likewise expressed by courts in other jurisdictions that have declined to impose a duty upon a "designated driver" to control the conduct of his or her passenger to prevent injury to an innocent third party. *See, e.g. Stephenson v. Universal Metrics, Inc.*, 251 Wis.2d 171, 641 N.W.2d 158, 169 (2002) ("Even if [the defendant] had assumed a duty to drive [the intoxicated motorist] home, [he] could not reasonably have been expected to maintain the amount of control over [the intoxicated motorist] necessary to prevent [him] from ever leaving on his own to drive.").[21] Particularly disquieting is the almost certain chilling effect upon the practice of "designated driving" that would result from the placement of such a heavy burden upon the public. *See Mulvey v. Cuviello*, 180 Misc.2d 139, 687 N.Y.S.2d 584, 588 (N.Y.Sup.1999) ("it would be * * * both paradoxical and violative of public policy to recognize the viability of the underlying causes of action [ex-

---

**20.** While Mr. Clukey's estimation of the time he left the house gathering differs from that recalled by the hostess, we note that plaintiff, in her appellate brief, concedes that the drop-off occurred at "approximately 12:30–12:45 a.m." It is undisputed that the collision occurred at approximately 1:30 a.m.

**21.** In *Stephenson v. Universal Metrics, Inc.*, 251 Wis.2d 171, 641 N.W.2d 158, 160 (2002), the estate of a motorist who was killed in an automobile collision with an intoxicated mo-

torist filed suit against the intoxicated motorist's co-worker, who had indicated to a bartender that he would drive the intoxicated individual home from an employer-sponsored event, but did not actually do so. Although the Supreme Court of Wisconsin recognized a duty on the part of the "designated driver" under the rationale of the Restatement (Second) *Torts* § 324A (1965), the court held that public policy considerations precluded the imposition of such liability. *Stephenson*, 641 N.W.2d at 171.

posing a 'designated driver' to liability], for were life breathed into the fabric thereof, it would likely discourage and deter others from serving in that capacity"). This public policy concern, among others, is discussed below.

## 6

## Public Policy Concerns

The public policy considerations associated with the practice of driving while intoxicated are all too familiar to this Court, the General Assembly, and the public at large. *See Willis*, 954 A.2d at 132 ("This Court frequently has recognized the public policy concerns surrounding drunk driving and the resulting carnage on our highways."). In response to these significant concerns, the General Assembly has made great efforts to ensure that the practice is curbed and that offenders are properly penalized.[22] In a similar vein, the General Assembly has decidedly regulated the purchase, possession, transportation, and consumption of alcohol by those under the age of twenty-one, as well as the provision of alcohol by adults to underage drinkers, in an attempt to address the disconcerting issue of underage drinking.[23] This Court has likewise recognized the Legislature's furtherance of "an overriding policy against not only underage drinking, but also an adult's provision of alcohol to minors * * *." *Martin*, 871 A.2d at 916.

In addition to legislative regulatory efforts and the judiciary's enforcement of such, the general public has likewise acknowledged the dangers of drunk driving and has furthered the policy against such conduct through the use of "designated drivers." As noted by the Supreme Court of Tennessee, "[d]esignated drivers offer a valuable, but limited service to those who become intoxicated." *Downs ex rel. Downs v. Bush*, 263 S.W.3d 812, 824 (Tenn.2008). To impose a new duty upon such drivers—a duty to control inebriated adult passengers and prevent them from committing tortious, or even criminal acts—would certainly chill the courteous offers of transportation now made by "designated drivers." *See Cardella v. Robinson*, 903 So.2d 613, 618 (La.Ct.App.2005) (recognizing the potential "chilling effect" upon designated driving in declining to impose a duty upon a driver "to other motorists to physically prevent an insistent, intoxicated adult from exiting [the] vehicle"); *see also Stephenson v. Ledbetter*, 596 N.E.2d 1369, 1373 (Ind.1992) ("To hold a driver liable for the irresponsible actions of an intoxicated passenger would cut against this important social policy of encouraging the use of designated drivers."). Equally unsettling is the uncertain potential exposure to liability for common carriers—and, particularly, taxi operators. Such a duty could easily be extended to such carriers, who would then be charged with controlling the conduct of an intoxicated adult passenger upon exiting the vehicle. *See Cardella*, 903 So.2d at 618.

After carefully reviewing the record and considering all relevant factors in our *ad hoc* analysis of the duty issue, we must conclude that the factual circumstances presented in this case do not give rise to the imposition of a duty upon Mr. Clukey, an adult, for the protection of innocent third parties like Mr. Johnson, to prevent an intoxicated Mr. Milner, likewise an

**22.** *See* G.L.1956 § 31–27–2, regulating the act of driving while under the influence of liquor or drugs; § 31–27–2.2, governing the same act resulting in death; and § 31–27–2.6, addressing the same conduct resulting in bodily harm. *See also* §§ 31–27–2.1; 31–27–2.3; 31–27–2.5, regarding the administration of, and refusal of chemical tests.

**23.** *See, e.g.,* G.L.1956 §§ 3–8–1; 3–8–4; 3–8–5; 3–8–6; 3–8–9; 3–8–10; 3–8–11.1, among other statutory enactments.

adult, from operating his vehicle on that fateful evening.

To impose such a duty in this case would amount to the creation of a new cause of action—an election that must be effected, if at all, by the Legislature. *See Ferreira*, 652 A.2d at 968. This Court also gives significant weight to the pervasive and proactive legislative action undertaken by the General Assembly in regulating the arena of drunk driving and alcohol consumption. Although the matter before this Court is not one grounded in social-host-liability theory, the reasoning underlying this Court's deference to the law-crafting power of our legislative branch in those cases easily harmonizes with our decision to likewise defer to the Legislature here. *See Willis*, 954 A.2d at 129 ("Whether an injured party should be able to maintain a cause of action arising from social-host liability rests with the Legislature, not the Court."). Particularly relevant is this Court's reasoning in *Ferreira*, 652 A.2d at 968, in which we observed that

> "[t]he imposition of liability upon social hosts for the torts of guests has such serious implications that any action taken should be taken by the Legislature after careful investigation, scrutiny, and debate. It is abundantly clear that greater legislative resources and the opportunity for broad public input would more readily enable the Legislature to fashion an appropriate remedy to deal with the scope and severity of this problem."

As is the case with social-host liability, the question of whether such a duty should be imposed upon the public—a duty that could arguably be considered as a "designated-driver" duty—is one that is appropriate for legislative research and community debate. Given the palpable issues in defining the scope and extent of such a duty, as evidenced in this case, we exercise judicial restraint and decline to impose such a duty on this occasion.[24]

Because we conclude that no duty existed in this case as alleged by the plaintiff, her negligence claim against the defendant must fail as a matter of law. Summary judgment was properly granted by the hearing justice.

## V

### Conclusion

For the reasons stated in this opinion, we affirm the judgment of the Superior Court. The record shall be remanded to the Superior Court.

---

**24.** We note that plaintiff proffered a duty argument based on a substantial assistance and encouragement theory, as set forth in the Restatement (Second) *Torts* § 876 (1979). Section 876 of the restatement addresses the topic of persons acting in concert, and states:
> "For harm resulting to a third person from the tortious conduct of another, one is subject to liability if he
> "(a) does a tortious act in concert with the other or pursuant to a common design with him, or

> "(b) knows that the other's conduct constitutes a breach of duty and gives substantial assistance or encouragement to the other so to conduct himself, or
> "(c) gives substantial assistance to the other in accomplishing a tortious result and his own conduct, separately considered, constitutes a breach of duty to the third person." *Id.* at 315.

Upon review of the record, we do not discern the facts of this case to give rise to a claim of liability under this theory.