NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-1285-20

VLADIMIR DIAZ,

     Plaintiff,

v.

HERBERT J. REYNOSO and
AWJ INC., d/b/a EL TANGO
ARGENTINA GRILL,

     Defendants,

and

ANGEL DOMINGUEZ,

     Defendant-Respondent,

and

THE CITY OF ENGLEWOOD,
NEW JERSEY, a Municipal
Corporation of the State of New
Jersey, County of Bergen, its
Officials, Employees and/or agents,
ANTHONY GALLO, Individually
and as a Police Officer of the City
of Englewood, and LOTHAIRS
PORTER, Individually and as a
Police Office of the City of
Englewood,

     Defendant-Appellants.
_____

> **APPROVED FOR PUBLICATION**
>
> **June 1, 2021**
>
> **APPELLATE DIVISION**

Argued April 26, 2021 – Decided June 1, 2021

Before Judges Sabatino, Gooden Brown, and DeAlmeida.

On appeal from an interlocutory order of the Superior Court of New Jersey, Law Division, Bergen County, Docket No. L-8244-19.

James F. Dronzek argued the cause for appellants (Chasan Lamparello Mallon & Cappuzzo, PC, attorneys; James F. Dronzek, of counsel and on the brief; Ryan J. Gaffney, on the brief).

Peter E. Mueller argued the cause for respondent (Harwood Lloyd, LLC, attorneys; Jeanne O. Marino, of counsel and on the brief; Peter E. Mueller, on the brief).

The opinion of the court was delivered by

SABATINO, P.J.A.D.

This interlocutory appeal from a Rule 4:6-2(e) dismissal order raises novel issues of legal duty and tort liability in a drunk driving context.

The issues concern whether a volunteer who assures police officers at a roadside stop of an apparently inebriated driver that he will take the driver and his car safely to a residence—but thereafter relinquishes the car to the driver before reaching that destination—can be civilly liable as a joint tortfeasor if the driver then collides with and injures another motorist.

In the present case, police officers stopped a driver who was traveling in the wrong direction on a one-way street. Perceiving the motorist was unfit to drive, the officers asked him if he could arrange for someone to pick him up. The motorist called a friend, who quickly arrived and assured the officers that he would drive the motorist and his car to another location. Relying on this assurance, the police issued a traffic ticket for a moving violation to the motorist and allowed the friend to drive him away. Minutes later, the friend returned the car to the motorist at a railroad crossing and separated from him. The motorist, who was intoxicated well over the legal limit, resumed driving and crashed his car into the plaintiff's vehicle. He later pled guilty to committing assault by auto while under the influence of alcohol.

The severely injured plaintiff sued the driver, a restaurant where the driver had been drinking that night, the police officers and their city employer, and the volunteer. The volunteer moved to dismiss the claims against him, arguing he owed no legal duty that could make him civilly liable to any extent for this accident.

After reviewing a video of the motor vehicle stop and a prosecutor's investigative report, the motion judge concluded the volunteer breached no legal duty to the injured plaintiff. The judge accordingly dismissed plaintiff's claims,

3

as well as the police defendants' related cross-claims for contribution, against the volunteer. This appeal ensued.

Applying statutory public policies and allied common law principles, we reverse the trial court's dismissal order.

We hold that a volunteer who fails to discharge his commitment to the police in such a situation and who willingly allows a visibly intoxicated motorist to resume driving can bear a portion of the civil liability for an ensuing motor vehicle accident caused by that drunk driver. The presence of such a legal duty will hinge upon whether the volunteer is advised by the police, or objectively has reason to know from the surrounding circumstances, that his or her promise is an important obligation and that failing to carry it out could result in civil financial consequences.

In recognizing these legal duties that may have been assumed by the volunteer, we do not absolve any other parties whose negligence, if proven, contributed to the harm, including the drunk driver himself, the police officials who failed to field test or arrest him, and the restaurant that served him alcohol. Their own respective shares of fault would need to be determined and allocated, based upon customary rules of proximate causation and joint tortfeasor liability.

A-1285-20

Because discovery had only just begun in this case and the factual record is not sufficiently developed to resolve these issues, the dismissal of the volunteer as a co-defendant was premature. We therefore remand for further proceedings in accordance with the principles stated in this opinion.

I.

The record existing as of the time of the motion ruling[1] reflects the following sequence of events.

<u>The Four Friends and the Drinking of Alcohol That Night</u>

At approximately 7:00 p.m. on September 22, 2018, defendants Herbert J. Reynoso and Angel Dominguez, accompanied by their friends Luis Gonzalez and Daniel Paredes, attended a rooftop party in Fort Lee. After leaving the party around 11:00 p.m., the four men went to El Tango Argentina Grill ("El Tango") in Englewood. They stayed at El Tango until approximately 1:45 a.m. on September 23. According to Reynoso's guilty plea colloquy, he consumed at

---

[1] We were advised at oral argument that several depositions were taken after we granted leave to appeal, and that the dismissed co-defendant's counsel participated, provisionally, in those depositions. We were not informed of additional facts that may have emerged or were clarified at those depositions, and appropriately confine our review to the record provided to the motion judge.

least two cocktails, a shot of tequila, and two beers at El Tango without eating any food there.

When they left El Tango, the group divided. Reynoso left El Tango driving his own vehicle, an Audi sedan, with Gonzalez as a passenger. Meanwhile, Paredes left in his own vehicle, a handicap-equipped van, with Dominguez as a passenger.

The Traffic Stop and the MVR Footage

Shortly thereafter, at about 1:53 a.m., Englewood Police Officer Anthony Gallo observed Reynoso's Audi make a turn going the wrong direction on Grand Avenue in Englewood, a one-way street. Gallo radioed for back-up and proceeded to stop Reynoso's vehicle.[2]

---

[2] Substantial portions of the stop were captured on Gallo's mobile video recorder ("MVR") footage filmed from his squad car. The video, which is about seventeen minutes long, was provided to the trial court and referred to several times during the motion argument. It is also discussed in the county prosecutor's investigative report.

The audio track of the recording picked up much, but not all of, the conversations that occurred during the traffic stop. Although the parties did not have a transcript of the audio track prepared, their briefs essentially agree on the wording of certain statements, and the judge and counsel referred to those statements at the motion hearing. To the extent our opinion conveys what appears on the soundtrack, we do so with the caveat that no verbatim transcript was created.

A-1285-20

As Officer Gallo approached Reynoso's Audi, Reynoso reached outside of the car and placed what appears to be his car keys on the roof above the driver's side. Officer Gallo leaned against the vehicle on the passenger side and queried Reynoso about traveling in the wrong direction on a one-way street.

Officer Gallo then proceeded to ask Reynoso and his passenger where they were coming from, and where they lived. Although the audio is not clear, it appears that at least one of the two men, most likely Gonzalez, told Gallo he was from Bergenfield.[3] At this point, a second patrol vehicle arrived and stopped next to Reynoso's vehicle.

As the back-up patrol vehicle was positioned to control traffic, Officer Gallo asked Reynoso where he was headed. Reynoso's response is indiscernible. Following up, Gallo asked Reynoso how he planned to get home and whether he felt capable of driving. Reynoso responded that he was able to drive.

Reynoso then offered to call someone to come pick him up, to which Officer Gallo responded that would be preferable. Gallo confirmed with Reynoso that someone who was in better condition and coming from home was

---

[3] The police report indicates that Reynoso resided in Fair Lawn, not Bergenfield, at the time of the accident.

A-1285-20

going to pick him and his car up. Meanwhile, Police Officer Lothairs Porter, the back-up patrolman, approached the Audi.

Reynoso then phoned a friend, asking if Dominguez could come pick him and Gonzalez up. Officer Gallo requested Gonzalez's identification, also asking how much he had to drink, and whether he could also call someone.

As Reynoso finished his call requesting to be picked up, Gallo told him that his friend would need take possession of the Audi or otherwise the police would need to take other unspecified "steps." Officer Porter stood by as the exchange occurred.

Gallo returned to his patrol vehicle as the group waited for Dominguez to arrive. Gallo asked Reynoso if his friend was in a better condition to drive, and Reynoso assured him he was. Reynoso further told Gallo would leave his car wherever the officer directed and that he would pick it up in the morning.

At this point, a van with Dominguez and Paredes appeared on the video screen, and Reynoso indicated that his friends had arrived.

Officer Gallo issued to Reynoso a traffic citation for driving the wrong direction on a one-way street. Neither he nor Officer Porter asked Reynoso to step out of the car, and they did not administer to Reynoso any field sobriety tests.

8

The exchange between Officer Gallo and Dominguez was short, as Dominguez had apparently been briefed off camera (or out of earshot) by Officer Porter. Gallo asked Dominguez if he was okay to drive and if Porter had explained to him what was going on. Dominguez responded that he was okay to drive, made some indiscernible comments about making a U-turn, and that he knew generally what was going on.

Dominguez told the officers he planned to take Reynoso to "Bergenfield." He then waited while Officer Gallo completed paperwork in his vehicle.[4]

At this point, Gonzalez got into the van with Paredes. Officer Porter retrieved the apparent keys from the top of the Audi and handed them to Dominguez. Officer Gallo told Dominguez the officers would help him make a U-turn, and that they should then go home to "Bergenfield" and drop off Reynoso.

The video ends as the Audi makes a U-turn and drives away. Paredes and Gonzalez followed the Audi in the van; it is unclear who was driving it.

---

[4] The police report indicates Dominguez resides in Bergenfield. The report also states that Dominguez said he was driving towards Gonzalez's residence in Bergenfield when he returned the car to Reynoso.

<u>Transfer of the Audi Back to Reynoso and the Ensuing Accident</u>

According to the investigative report, Dominguez told police during a recorded interview[5] that after leaving the scene of the traffic stop, he drove Reynoso to Bergenfield. When the Audi reached a railroad crossing near West Central Avenue in Bergenfield, he stopped to allow a train to pass. According to Dominguez, while they were stopped, "Reynoso began arguing with Dominguez and demanding he drive his [car]."

Eventually Dominguez relented. He got out of the Audi and switched places with Gonzalez, who had been in the van behind them with Paredes. Gonzalez got in the passenger seat of the Audi, with Reynoso back at the wheel.

Dominguez apparently did not see Reynoso again that night. He stated he did not know a crash had occurred until the next morning when he received a call. He admitted he knew Reynoso had been drinking that night because he had seen him at both the rooftop party and El Tango, albeit he did not know how much Reynoso had to drink because he did not keep track.

---

[5]  The record does not contain a transcript of the interview, but it is detailed within the seven-page investigative report of the county prosecutor that was furnished to the motion judge.

After Dominguez surrendered control of the Audi, Reynoso drove briefly to Gonzalez's home and dropped him off. The investigative report summarized Gonzalez's recorded statement as follows:

> Gonzalez stated that after Reynoso took control of his Audi at the train tracks in Bergenfield he drove to Gonzalez's house and dropped him off. Gonzalez stated that he knew Reynoso should not be driving and he was going to follow him home. Gonzalez followed Reynoso and while they were on Route 4 West Gonzalez passed Reynoso. Almost immediately after passing Reynoso, Gonzalez saw sparks in his rearview mirror and saw Reynoso's car leave the roadway. Gonzalez stopped the vehicle and called 911 . . . . Due to the Reynoso [Audi] coming to a rest such a significant distance from the [plaintiff's] Jeep, Gonzalez was unaware there was a second vehicle involved in the accident.

It is unclear if Gonzalez himself was inebriated.

The investigative report reflects that at approximately 2:40 a.m., Paramus Police received emergency calls reporting a serious motor vehicle accident on Route 4 West. Upon arrival at the scene, officers began rendering medical aid to both plaintiff Diaz and defendant Reynoso. The officers identified two vehicles, a 2011 Audi A4 overturned in a retail store parking lot and, a significant distance away, a Jeep Grand Cherokee driven by plaintiff Diaz that was on the right shoulder of the road. The Jeep was heavily damaged, having been struck by the Audi and then colliding with a utility pole. The accident took

11

place about thirty-three minutes after the officers had issued the traffic ticket to Reynoso.

The investigative report concluded that "based upon the roadway evidence and damage to the vehicles . . . the Reynoso [vehicle] struck the [plaintiff's] Jeep from behind causing both vehicles to lose control."

Responding officers sent both Diaz and Reynoso to the hospital. Diaz was in critical condition.[6] Responding officers also detected a strong odor of alcohol emanating from Reynoso and found a flask in his Audi.

Once at the hospital, Reynoso gave his consent to have hospital staff draw his blood for toxicological testing, which was then turned over to and secured by the Paramus Police. Reynoso's Blood Alcohol Concentration ("BAC") was 0.244%, well over the 0.08% BAC legal limit, when it was drawn several hours after the accident.

Reynoso pled guilty to the offense of third-degree assault by auto while under the influence of alcohol, resulting in serious bodily injury to the victim. N.J.S.A. 2C:12-1(c)(2).

---

[6] Plaintiff suffered an intracranial bleed, a skull fracture with a cerebral contusion, a temporal bone fracture, and a sphenoid sinus fracture. According to the complaint, plaintiff was hospitalized with a medically induced coma for seventeen days and he underwent multiple surgeries.

In December 2019, Diaz filed a complaint in the Law Division seeking damages for injuries he sustained in the motor vehicle collision. He initially named as defendants: Reynoso; AWJ, Inc., doing business as El Tango; along with Police Officers Gallo and Porter and the City of Englewood ("the Englewood defendants"). He alleged each of the defendants had acted negligently in the events leading up to the accident.

Plaintiff also named as a fictitious "John Doe" defendant the person who responded to the motor vehicle stop and who volunteered to drive Reynoso and his vehicle away. The complaint described him as "an individual who Reynoso contacted between the hours of 1:53 AM and 2:12 AM on September 23, 2018. John Doe represented to Defendant Englewood Police Officers that he would drive a visibly intoxicated Reynoso home after officers observed Reynoso drunk driving and decided not to arrest him."

After learning of Dominguez's identity, plaintiff moved for leave of court to substitute him into the case. The court granted that motion without opposition. The other co-defendants then asserted cross-claims against Dominguez for contribution and indemnity.

After answering the complaint and denying liability, Dominguez moved under Rule 4:6-2(e) to dismiss the allegations against him with prejudice, for failure to state a claim upon which relief can be granted. Both the Englewood defendants and plaintiff opposed the motion.

The Motion Judge's Decision

Oral argument on the dismissal motion was heard on December 4, 2020, at which counsel for Dominguez, plaintiff, and the Englewood defendants all participated. Without objection by the parties, the motion judge was supplied with and considered materials outside of the body of the complaint, namely the prosecutor's investigative report and the MVR recording.

The focus of the motion argument was upon whether Dominguez assumed a legal duty when he volunteered to the police that he would drive Reynoso and his car from the roadside stop and, if so, whether he breached that duty. Dominguez advocated that he assumed no duty to a third-party motorist such as plaintiff, and that he breached no such duty.

Counsel for the Englewood defendants asserted that although it was undisputed that Dominguez took control of the vehicle and agreed with the officers to take Reynoso somewhere, there was a factual dispute as to exactly where Dominguez agreed to take him. According to counsel, "if you listen [to

the audio] closely . . . it's a little bit garbled," you can hear Dominguez identify "166 West Main Street" as the location where he was going to take Reynoso. Counsel further argued that the lack of clarity on this particular issue made it "early in this case to be talking about" dismissing the claims against Dominguez.

Plaintiff's counsel, meanwhile, argued that "assuming Mr. Dominguez stays in the case," an important and disputed fact arising from the video was whether Dominguez agreed to take Reynoso "home" (i.e., the address in Fair Lawn that police constructively knew of from Reynoso's driver's license) or instead to an address in Bergenfield (as apparently represented on the video). Counsel argued that determining this fact was important because "it reflects back on the police that they should [have] known that Bergenfield was not where Mr. Reynoso belonged."

The judge granted the motion to dismiss. He issued an oral opinion concluding that the "undisputed facts are that [Dominguez] had no duty to [plaintiff]." As the judge reasoned:

> Angel Dominguez at best, had a duty to drive away from a scene of a motor vehicle stop by the City of Englewood. After that, how a duty gets created or a permanent continuing duty is not found in any evidence that's submitted or any of the allegations here.
>
> The clear statement is that Dominguez relinquished dominion and control of a motor vehicle

A-1285-20

back to [Reynoso]. <u>All he was asked to do by the police was to drive away, which he did</u>, in fact then went home to his home in Bergenfield, which again the police knew about.

But the bottom line is <u>there cannot be a continuing ad infinitum duty</u>. We are not permanently our brother's keeper. . . . <u>There is no duty</u>. The law is clear citing [<u>Lombardo v. Hoag</u>, 269 N.J. Super. 36, 56 (App. Div. 1993)].

There is no duty assumed for continued control or supervision. <u>All that we know is that the . . . only duty that was created was that he was to take the vehicle and drive to Bergenfield, which apparently he did based on this. And to create a duty and a continuing duty ad infinitum over somebody else's vehicle and over some other person who was not incarcerated or arrested is inapposite to . . . our law</u>.

[(Emphasis added).]

The court accordingly entered an order granting the motion to dismiss all claims and cross-claims against Dominguez, with prejudice.

The Englewood defendants moved for leave to appeal, which we granted to consider the important and novel issues of law presented. Plaintiff has elected to not participate in the interlocutory appeal, indicating he will simply abide by this court's decision.

16

II.

A.

We examine the legal issues mindful of several familiar principles that guide our review.

First, on a motion to dismiss a pleading under Rule 4:6-2(e) for a failure to state a viable claim, a court must "search[] the complaint in depth and with liberality to ascertain whether the fundament of a cause of action may be gleaned even from an obscure statement of claim, opportunity being given to amend if necessary." Printing Mart-Morristown v. Sharp Elecs. Corp., 116 N.J. 739, 746 (1989) (quoting Di Cristofaro v. Laurel Grove Mem'l Park, 43 N.J. Super. 244, 252 (App. Div. 1957)); see also Banco Popular N. Am. v. Gandi, 184 N.J. 161, 165 (2005). The court's assessment must be performed in a manner that is "generous and hospitable." Printing Mart, 116 N.J. at 746. The court's role is limited to determine whether a cause of action is "suggested" by the complaint. Ibid. (quoting Velantzas v. Colgate-Palmolive Co., 109 N.J. 189, 192 (1988)).

In the present case, the motion judge was supplied with and considered materials outside of the four corners of the pleadings, namely the MVR recording and the prosecutor's investigative report. Rule 4:6-2 prescribes that in such situations where "matters outside the pleading are presented to and not

A-1285-20

excluded by the court, the [Rule 4:6-2(e) dismissal] motion shall be treated as one for summary judgment and disposed of as provided by Rule 4:46." R. 4:6-2; see also Dimitrakapoulous v. Borrus, Goldin, Foley, Vignuolo, Hyman and Stahl, P.C., 237 N.J. 91, 107 (2019). Although the trial court here did not expressly convert the dismissal motion to a summary judgment motion, the standards of the latter have pertinence.

On a motion for summary judgment, the court must "consider whether the competent evidential materials presented, when viewed in the light most favorable to the non-moving party, are sufficient to permit a rational factfinder to resolve the alleged disputed issue in favor of the non-moving party." Brill v. Guardian Life Ins. Co. of Am., 142 N.J. 520, 540 (1995); see also R. 4:46-2(c). If there are materially disputed facts, the motion for summary judgment should be denied. Brill, 142 N.J. at 540. To grant the motion, the court must find that the evidence in the record "is so one-sided that one party must prevail as a matter of law." Ibid. (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986)).

Second, regardless of whether Dominguez's application is treated as a dismissal motion or a summary judgment motion, we owe no special deference to the trial court's legal assessment of the parties' submissions. A reviewing

18

court "appl[ies] a plenary standard of review from a trial court's decision to grant a motion to dismiss." Gonzalez v. State Apportionment Comm'n, 428 N.J. Super. 333, 349 (App. Div. 2012) (quoting Rezem Family Assocs., LP v. Borough of Millstone, 423 N.J. Super. 103, 114 (App. Div. 2011)). We "owe[] no deference to the trial court's conclusions." Ibid.

Similarly, our review of an order granting summary judgment must observe the same standards as the trial court, including the obligation to view the record in a light most favorable to the non-moving parties. See IE Test, LLC v. Carroll, 226 N.J. 166, 184 (2016) (citing Brill, 142 N.J. at 540). We accord no special deference to a trial judge's assessment of the submitted record, as the decision to grant or withhold summary judgment does not hinge upon a judge's determinations of the credibility of testimony rendered in court, but instead amounts to a ruling on a question of law. See Manalapan Realty, L.P. v. Twp. Comm. Manalapan, 140 N.J. 366, 378 (1995) (noting that no "special deference" applies on appeal to a trial court's legal determinations).

Third, the main focus of the motion and this appeal concerns whether Dominguez assumed any legal duties when he volunteered to drive the inebriated Reynoso and his car from the place of the police stop to another location and assured the officers he would carry out that task. The issue of duty

is predominantly a question of law, although it can be affected by the presence or absence of facts.

In Estate of Narleski v. Gomes, 244 N.J. 199 (2020), the Supreme Court reiterated last year the four factors that ordinarily bear upon the recognition of a legal duty. The factors are: "the relationship of the parties, the nature of the attendant risk, the opportunity and ability to exercise care, and the public interest in the proposed solution." Id. at 223 (quoting Hopkins v. Fox & Lazo Realtors, 132 N.J. 426, 439 (1993)).

The analysis of duty "is both very fact-specific and principled; it must lead to solutions that properly and fairly resolve the specific case and generate intelligible and sensible rules to govern future conduct." Estate of Campagna v. Pleasant Point Props., LLC, 464 N.J. Super. 153, 178 (App. Div. 2020) (quoting Hopkins, 132 N.J. at 439), certif. denied, 245 N.J. 585 (2021).

B.

The issues of duty here are influenced by both public policies codified in our New Jersey statutes and general common law principles of tort law. An important facet of those public policies and tort principles is the context of this case: a motor vehicle collision caused by a drunk driver which badly injures an innocent person.

20

As the Supreme Court recently observed in Narleski, "[i]ntoxicated driving remains one of the preeminent public safety threats in New Jersey, as evidenced by the mayhem caused on our highways by drunk drivers to this day." 244 N.J. at 213 (citation omitted). The Court noted this "State's public policy of imposing severe sanctions on drunk drivers . . . has deep roots in our law." Ibid. The Court invoked those strong policy considerations in Narleski in endorsing and amplifying this court's adoption of a new common law rule of tort liability in a drunk driving context. Under that new rule, a plaintiff injured by an intoxicated underage social guest may recover damages from an underage social host, provided that several conditions are met. Id. at 228.

The Court explained in Narleski that the new rule of tort liability it imposed on a person who helped enable a drunk driver to get behind the wheel of a car was "foreshadowed" by case law. Ibid. The liability rule is the "logical extension of our common law jurisprudence and legislative enactments aimed at combatting drunk driving and providing fair compensation for its victims." Ibid. (emphasis added).

Here, a pertinent "legislative enactment" is what is known as "John's Law," N.J.S.A. 39:4-50.22. Pursuant to that statute, law enforcement officers must provide a written warning to individuals to whom they release drunk

21

drivers who have been arrested or held in custody for violations of N.J.S.A.

39:4-50 (Driving While Intoxicated).

John's Law prescribes, in relevant part:

> Whenever a person is summoned by or on behalf of a person who has been arrested for a violation of [N.J.S.A. 39:4-50] in order to transport or accompany the arrestee from the premises of a law enforcement agency, the law enforcement agency shall provide that person with a written statement advising him of his potential criminal and civil liability for permitting or facilitating the arrestee's operation of a motor vehicle while the arrestee remains intoxicated.
>
> [N.J.S.A. 39:4-50.22 (emphasis added).]

The statute continues:

> The person to whom the statement is issued shall acknowledge, in writing, receipt of the statement, or the law enforcement agency shall record the fact that the written statement was provided, but the person refused to sign an acknowledgment.
>
> . . . .
>
> The Attorney General shall establish the content and form of the written statement and acknowledgment to be used by law enforcement agencies throughout the State and may issue directives to ensure the uniform implementation of this act.
>
> [Ibid. (emphasis added).]

A-1285-20

John's Law implicitly presumes that a person who undertakes to take a drunk driver safely away from the police can have "potential civil and criminal liability" for allowing that person to resume driving while intoxicated.  Ibid. Although the statute does not identify the legal authority for such potential liability, it supports appellants' arguments in this case in favor of imposing a legal duty of care upon Dominguez.

When enacting John's Law, the Senate Law and Public Safety Committee issued an official Statement explaining that "a person who permits another to drive while intoxicated (DWI) violates [N.J.S.A. 39:4-50] (the State Drunk driving statute)." S. Law & Pub. Safety Comm. Statement to S. 1587 (Nov. 9, 2000).  The Statement underscored the public purpose of the statute:

> Drunk drivers constitute a serious threat to the public safety.  Recently, a person charged with DWI was picked up at the police station by a person who was to take the intoxicated person to his home.  Instead, the intoxicated person was taken back to his vehicle which he then drove.  An ensuing motor vehicle collision tragically claimed the life of a young man, John Elliott. John, who grew up in Egg Harbor Township, had just graduated from the United States Naval Academy in May 2000.  The sponsor has designated this bill as "John's Law."
>
> [Ibid. (emphasis added).]

23

The model statement created by the Attorney General in a directive implementing John's Law provides:

> The defendant has been arrested and charged with one or both of the motor vehicle violations checked in the box above. Pursuant to N.J.S.A. 39:4-50.22, this WARNING is to advise you that <u>if you accept responsibility to transport or accompany the defendant, and you permit or facilitate the operation of a motor vehicle by the defendant while the defendant is intoxicated</u> or has a blood alcohol concentration at, or above, that permitted by law (N.J.S.A. 39:4-50), <u>then you are potentially subject to criminal penalties and civil liability</u>.
>
> [<u>Att'y Gen. Law Enf't Directive No. 2004-1</u>, "<u>Potential Liability Warning Form - Release Of DWI Arrestee & 12 Hour Impoundment Of The Vehicle Of A DWI Arrestee</u>," 7 (Feb. 20, 2004) (emphasis added).]

The liability warning called for under John's Law was not literally triggered in this case, because the police did not arrest[7] Reynoso, and Dominguez did not pick him up "from the premises of a law enforcement agency." Even so, the statute presupposes that our civil and criminal laws

---

[7] The scope of this appeal does not concern whether the police officers were remiss in failing to take Reynoso into custody, or at the very least administer to him field sobriety tests. We do note their failure (unexplained in this limited record) is troubling, and leave that determination to the trial court, subject to whatever defenses or immunities may pertain under the Tort Claims Act or otherwise.

already contemplate that a volunteer who undertakes to take away a drunk driver safely from the police has a legal duty to carry out that commitment.

Another statutory provision that bears upon the matter is within N.J.S.A. 39:4-50, the general prohibition on drunk driving. In particular, that statute makes it an offense to knowingly "permit" a visibly intoxicated person to drive:

> (a) A person who operates a motor vehicle while under the influence of intoxicating liquor, narcotic, hallucinogenic or habit-producing drug, or operates a motor vehicle with a blood alcohol concentration of 0.08% or more by weight of alcohol in the defendant's blood <u>or permits another person</u> who is under the influence of intoxicating liquor, narcotic, hallucinogenic or habit-producing drug <u>to operate a motor vehicle the person owns or which is in the person's custody or control or permits another to operate a motor vehicle with a blood alcohol concentration of 0.08% or more by weight of alcohol</u> in the defendant's blood <u>shall be subject</u> . . . [to the enumerated penalties].
>
> [<u>Ibid.</u> (emphasis added).]

This statute thus imposes quasi-criminal liability for "permitting" an intoxicated individual to operate a motor vehicle. <u>See</u> <u>State v. Stas</u>, 212 N.J. 37, 49-50 (2012) ("To convict a defendant of [permitting an intoxicated individual to drive], the State must demonstrate beyond a reasonable doubt that he or she had actual or constructive knowledge of the driver's intoxication, that he or she

permitted the driver to operate the vehicle, and that the vehicle was under the defendant's custody or control.").

Here, the actual extent of Dominguez's knowledge of Reynoso's degree of inebriation was not yet developed in the record. His "custody or control" of the Audi was at least temporarily entrusted to him when the vehicle was released to him with police approval at the end of the traffic stop. We do not know exactly what occurred at the railroad crossing and whether, for example, Reynoso threatened to use physical force against Dominguez if he did not allow him to resume driving the Audi. In any event, Dominguez was not charged with a permissive driving violation under N.J.S.A. 39:4-50. But regardless of whether such charges were brought, the statute provides another supporting beam in the foundation for his potential liability under civil law.

Turning to civil law, we note several well-established common law principles that are consistent with a recognition of a legal duty on the part of the volunteer driver.

Appellants point to Section 324 of the Restatement (Second) of Torts (Am. Law Inst. 1965), entitled "Duty of One Who Takes Charge of Another Who Is Helpless." Section 324 is a more specific application of the rule stated in Section 323 ("Performance of Undertaking to Render Services"). Section 324's

"particular feature is that the plaintiff is in a helpless position, which is an important factor in determining whether the actor may discontinue the aid or protection which he has undertaken to give." Id. at cmt. a.

Section 324 provides:

> One who, being under no duty to do so, takes charge of another who is helpless adequately to aid or protect himself is subject to liability to the other for any bodily harm caused to him by
>
>> (a) the failure of the actor to exercise reasonable care to secure the safety of the other while within the actor's charge, or
>>
>> (b) the actor's discontinuing his aid or protection, if by so doing he leaves the other in a worse position than when the actor took charge of him.
>
> [(Emphasis added).]

Comment b to Section 324 provides that the "rule stated . . . is applicable whenever one takes charge of another who is incapable of taking adequate care of himself. It applies equally where the other is rendered helpless by his own conduct . . . as where the actor takes charge of one who is . . . drunk." (Emphasis added); see also Podias v. Mairs, 394 N.J. Super. 338, 347 (App. Div. 2007) (adopting § 324 and stating: "So too, at common law, those under no pre-existing duty may nevertheless be liable if they choose to volunteer emergency assistance for another but do so negligently").

Section 324 of the Second Restatement addresses liability for harm sustained by the helpless person, and does not address the situation in which the helpless person foreseeably causes harm to a third person once the volunteer abandons his or her "undertaking." Nevertheless, the provision does signify that a volunteer who assumes a duty of care over a helpless person may bear legal responsibilities when agreeing to do so.

More recently, the American Law Institute promulgated the Restatement (Third) of Torts: Liability for Physical and Emotional Harm (Am. Law Inst. 2012). Section 44 of the Third Restatement, entitled "Duty to Another Based on Taking Charge of the Other," clarifies Section 324 of the Second Restatement. The Third Restatement reads as follows:

> (a) An actor who, despite no duty to do so, takes charge of another who reasonably appears to be:
>
> (1) imperiled; and
>
> (2) helpless or unable to protect himself or herself has a duty to exercise reasonable care while the other is within the actor's charge.
>
> (b) An actor who discontinues aid or protection is subject to a duty of reasonable care to refrain from putting the other in a worse position than existed before the actor took charge of the other and, if the other reasonably appears to be in imminent peril of serious physical harm at the time of termination, to exercise

A-1285-20

> reasonable care with regard to the peril before terminating the rescue.
>
> [Restatement (Third) of Torts: Liability for Physical and Emotional Harm § 44 (Am. Law Inst. 2012) (emphasis added).]

Comment g of Section 44 of the Third Restatement, similar to its predecessor Section 324 of the Second Restatement, states that the provision is "equally applicable to one who is rendered helpless by his or her own conduct, including intoxication."

As a corollary to this principle, Section 41 of the Third Restatement imposes a duty to third parties upon an actor who takes control of another by virtue of a "special relationship." That provision states:

> (a) An actor in a special relationship with another owes a duty of reasonable care to third parties with regard to risks posed by the other that arise within the scope of the relationship.
>
> (b) Special relationships giving rise to the duty provided in Subsection (a) include:
>
> (1) a parent with dependent children,
>
> (2) a custodian with those in its custody,
>
> (3) an employer with employees when the employment facilitates the employee's causing harm to third parties, and
>
> (4) a mental-health professional with patients.

29

[Id. at § 41 (emphasis added).]

Regarding "custodians" with such obligations, Comment f of Section 41 explains that "the custodial relationship need not be complete physical custody . . . so long as there is some custody and control of a person posing dangers to others." Illustrating that point, the Comment to Section 41 cites to Bailey v. Town of Forks, 737 P.2d 1257, 1260-62 (Wash. 1987), wherein the Supreme Court of Washington determined that a police officer who did not take custody of an intoxicated driver pursuant to his statutory duty was held liable to a plaintiff who was later injured by that driver.[8]

We recently applied Section 41 of the Third Restatement in Vizzoni v. B.M.D., 459 N.J. Super. 554, 572-74 (App. Div. 2019), rejecting an argument by a therapist that he had no duty to take reasonable care in prescribing medications to a patient who then fatally injured a cyclist in a vehicular accident. Despite the existence of that duty, we affirmed summary judgment dismissing the plaintiff's claims because plaintiff had not made a prima facie showing that

---

[8] The Washington case appears at first blush supportive of plaintiff's claims against the Englewood defendants, subject to further development of the factual record and possible defenses such as intervening causation and the Tort Claims Act.

A-1285-20

the accident was caused by the patient's impairments from the prescriptions. Ibid.

We do not reach here whether Dominguez in this case falls within the ambit of Section 41 as a "custodian" of Reynoso or whether he assumed a "special relationship" with Reynoso after promising the police that he would drive him and his car away. Whether or not Section 41 literally applies, it adds to the more general notion that a volunteer who commits to law enforcement that he or she will take charge of an inebriated driver can be held liable for willingly abandoning that commitment.

During the motion hearing, Dominguez cited, and the judge relied upon, this court's opinion in Lombardo v. Hoag, 269 N.J. Super. 36 (App. Div. 1993), affirming summary judgment. We do not consider Lombardo to be factually akin to this case. In Lombardo, a group of friends had been out socializing and driving until the wee hours of the morning. During the course of the night, a member of the group drove his pickup truck from location to location, and according to the plaintiff, became excessively inebriated. Towards the end of the evening, a co-passenger took control of the truck to drive himself home. When that passenger arrived at his home, he turned over control of the vehicle back to the truck's owner. On the way to dropping off the remaining passengers,

31

the truck owner, apparently distracted by his then paramour, caused the truck to crash, injuring the plaintiff riding in the truck. Id. at 40-45. We found no duty existed among the passengers to one another, except to refrain from interfering with the driver and, in some circumstances, object to the vehicle clearly being driven negligently. Id. at 53-55. We thus affirmed summary judgment dismissing the claims against the co-passenger. Id. at 57.

Lombardo differs from the present case in that it did not involve any interactions with police officers. The co-passenger who took over the wheel of the truck made no assurances to the police that he would drive his inebriated friend to a specific place and not permit him to resume driving. There was no reliance by law enforcement. Nor was there any notice of potential liability provided, as in John's Law. The case is not on point.

Cases from other jurisdictions have grappled with related issues, although they also do not have facts comparable to those here.

In Stephenson v. Universal Metrics, Inc., 641 N.W. 2d 158 (Wis. 2002), the Wisconsin Supreme Court upheld summary judgment in favor of a co-worker who had casually told a bartender at a company social gathering that he would drive his fellow employee home. The bartender relied on that representation and continued to serve the fellow employee alcohol. By the end of the evening

32

the fellow employee had become considerably inebriated, and the co-worker changed his mind about driving him home. The fellow employee drove himself away from the premises and had a fatal accident. His estate sued the co-worker for failing to take the drunk employee home. The Court declined to impose liability, expressing concerns that the "stopping point" of a duty could be indefinite. Id. at 169-70. Although we appreciate that Court's concerns about liability limitations, the facts in Stephenson did not involve any assurances by a volunteer made to police officers.

In another case not involving assurances to police officers, the Supreme Court of Rhode Island in Gushlaw v. Milner, 42 A.3d 1245 (R.I. 2012), declined to impose a duty upon drivers to prevent the tortious conduct of an intoxicated passenger. Id. at 1261. In Gushlaw, two defendants, both underage adults, attended a hotel party where drinking had occurred and brought their own alcohol. Id. at 1247-48. After drinking at the hotel, they drove to another party where they apparently did not drink any more alcohol and were asked to leave due to bombastic behavior. Ibid. The elder of the two defendants offered to drive the younger one to his vehicle, which was further away from the party than his actual home. The elder defendant then left the younger one with his vehicle, and shortly thereafter the younger man was involved in a deadly crash. Id. at

33

1249. The elder defendant was sued by the plaintiff's estate on a theory that he negligently left the younger defendant with his vehicle with knowledge that he was not fit to drive. Ibid.

The Supreme Court of Rhode Island reasoned in Gushlaw that the facts of this scenario did not sufficiently give rise to a "special relationship" between the defendants, nor did they "indicate that [the younger defendant] was under [the older defendant's] charge or control." Id. at 1257. The Court observed the public service of stopping the younger defendant from driving "was not the obligation that [the older defendant] agreed to perform" and he had not gratuitously undertaken that objective. Ibid. Based upon this reasoning, the Court determined that there was no duty of care owed to the third party. Again, we stress the Rhode Island case did not involve any assurances made to police officers.

Reaching an opposite result in Downs ex rel. v. Bush, 263 S.W.3d 812 (Tenn. 2008), the Supreme Court of Tennessee held there was a genuine issue of material fact as to whether a decedent was helpless and whether defendants had taken charge of him. The decedent had been drinking alcohol with a group of friends at his apartment, and at some point the group decided to drive around in one of the friends' pick-up truck. They had a designated driver who had not

A-1285-20

been drinking.  Id. at 815-16.  When the decedent became belligerently drunk and began acting erratically, the group decided to return home.  As they drove home, decedent fell ill and vomited on the side of the road.  The friends then aided the decedent in lying down in the bed of the pick-up truck and continued the drive with him in that open location.  Id. at 816-17.  At some point, the decedent apparently fled from the truck, and attempted to run across the highway, where he was struck by two vehicles and killed.  Id. at 817-18.

Discussing Section 324 of the Second Restatement, the Supreme Court of Tennessee stated that a "jury could easily conclude that the dangers of riding unrestrained in the bed of a pick-up on an interstate highway are foreseeable and obvious."  Id. at 821-22.  Based on this, the Court determined that there was a genuine issue of material fact to be determined by the jury as to whether defendants helped put the decedent in the truck bed, or whether he went there of his own volition.  Ibid.  The Court further concluded that whether the decedent was "helpless" or whether defendants "took charge" of him were genuine issues of material fact to be determined by the jury.  Id. at 822-23.  Once again, this is not a case that involved police officers, nor did it even involve a drunk driver.

A-1285-20

## C.

Taking into account these statutory and case law authorities, we conclude the trial court erred in dismissing outright the claims against the volunteer, Dominguez, at this early stage of the lawsuit. Viewing the existing record in a light most favorable to the non-moving parties, there are genuine issues of material fact as to whether Dominguez assumed and breached a legal duty after advising the police officers that he would drive Reynoso and his car from the motor vehicle stop.

As previewed in our introduction, we hold that a volunteer who fails to discharge his commitment to the police that he or she will take charge of a person who appears to be unfit to drive and who thereafter willingly allows that visibly intoxicated motorist to resume driving can bear a portion of the civil liability for an ensuing motor vehicle accident caused by that drunk driver. The recognition of such a common law duty is consistent with the safety-promoting public policies set forth in John's Law and other drunk driving laws, as well as basic tort doctrines that disfavor negligent conduct by persons who agree to take care of a helpless individual.

A-1285-20

If the drunk vehicle owner coerces the volunteer to return the vehicle, the obligation for the volunteer to act reasonably could encompass a duty to call 9-1-1 and advise the police that the impaired motorist has resumed driving.

The factual record of what occurred at the railroad crossing in this case needs to be developed more to evaluate the reasonableness of the volunteer's actions. Further discovery may illuminate other pertinent facts, including what Officer Porter and Dominguez discussed off camera, what specific assurances were made, and what the mutually intended destination in "Bergenfield" was. We agree with appellants that the motion judge erred in finding that Dominguez's duty ended once the Audi crossed over the town border.

One major caveat. The presence of such a legal duty will hinge upon whether the volunteer is advised by the police, or objectively has reason to know from the surrounding circumstances, that his or her promise is an important obligation and that failing to carry it out could result in civil financial consequences. Adding such an actual or constructive notice condition to the common law rule is in keeping with the analogous notice feature of John's Law.

This common law duty we recognize today meets the Hopkins criteria. Hopkins, 132 N.J. at 439. The duty takes into account the relationship of the parties, including the incapacitated driver, the volunteer, and law enforcement

37

officials. It also considers the nature of the attendant risk from perilous driving that might be resumed by the drunk driver, plus the opportunity and ability of the volunteer to exercise care in preventing that risk. Most importantly, the recognition of the duty advances the public interest in keeping dangerous inebriated drivers off the roads.

Having delineated these legal duties that may have been assumed by the volunteer, we again stress that we do not absolve any other parties whose negligence, if proven, contributed to the harm. That includes the drunk driver himself, the police officials who failed to field test or arrest him, and the restaurant that served him alcohol. Subject to any applicable defenses, their own shares of fault would need to be determined and allocated, based upon customary rules of proximate causation and joint tortfeasor liability.

D.

The core message of this opinion can be bluntly stated: If you promise the police that you will take charge of a drunk driver and his or her car, you will be counted on to do so. You can be held liable if you don't.

The order dismissing Dominguez as a defendant is reversed, without prejudice to him potentially renewing a motion for summary judgment at the end of discovery, guided by the legal standards of this opinion.

38

A-1285-20

Reversed and remanded for further proceedings. We do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION